# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2732

_____

William Carpenter,                    *
                                      *
                Appellant,            *
                                      *   Appeal from the United States
        v.                            *   District Court for the Southern
                                      *   District of Iowa.
Con-Way Central Express, Inc.,        *
                                      *
                Appellee.             *

_____

Submitted: January 12, 2007
Filed: March 28, 2007

_____

Before LOKEN, Chief Judge, BYE and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

William Carpenter appeals the district court's[1] adverse grant of summary judgment on his race discrimination, hostile work environment, and retaliation claims brought under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII) and the Iowa Civil Rights Act of 1965, Iowa Code ch. 216 (ICRA).  After a de novo review, we affirm the judgment of the district court.

_____

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

# I

Carpenter, who is Caucasian, was married to an African American from 1994 through December 2001. He worked as a driver/sales representative for Con-Way Central Express, Inc. (CCX), a freight trucking company, from May 1993 through August 2004. Carpenter claims he was subjected to discrimination because of his ex-wife's race and suffered pervasive harassment giving rise to a hostile work environment. He also argues CCX retaliated against him after he opposed discrimination at CCX by testifying in another employee's race discrimination lawsuit against CCX.

Carpenter's allegations center on the actions of Rick Hardy, a non-managerial employee at CCX, who made racially charged remarks to CCX employees. A number of Carpenter's co-workers testified Hardy used the term "nigger" on different occasions. One co-worker testified Hardy once stated "everybody should own" a "nigger." J.A. 201. Another co-worker testified Hardy told him Carpenter had referred to his ex-wife as "Jamaican," but in Hardy's view she was "nothing but a nigger." J.A. 258. He testified Hardy "was always calling [Carpenter] a nigger lover and stuff like that behind his back." J.A. 259. Hardy stated "[Carpenter] makes the rest of us look bad by doing stuff like that." Id. Hardy "was constantly raging about [Carpenter] being married to a black gal." Id. Another co-worker stated he heard Hardy call Carpenter a "nigger lover to the core." J.A. 39. Hardy did not make any of these comments in Carpenter's presence. Carpenter's co-workers told Carpenter of Hardy's "nigger" and "nigger lover to the core" comments for the first time in May or June 2004. J.A. 128. Carpenter testified, "There were no racial comments, but [Hardy] was just always being a smart ass." J.A. 128. Carpenter testified he never told anyone in management at CCX about Hardy's "nigger," "nigger-lover," or "nigger to the core" comments. J.A. 128. Carpenter states Hardy did make one racist comment in his presence. Carpenter testified when he and his ex-wife were divorcing, Hardy commented, "That's what you get for marrying those type." J.A. 104.

Carpenter asked, "What do you mean by 'those type?'" Id. Hardy responded, "You know what I mean." Id.

Carpenter alleges Hardy continually harassed him at work. Hardy made antagonistic, although apparently not racist, comments such as "why don't you just quit?" to Carpenter on a weekly basis. Carpenter testified Hardy intentionally misloaded his trailer on an estimated twenty occasions between 2000 and 2004, placing the wrong freight on the trailer, putting early deliveries in the front (rather than the back) of the trailer, or loading the trailer so it was not balanced. J.A. 98. Carpenter also testified he *saw* Hardy put trash and debris (e.g., plywood, dunnage, and garbage cans) in his trailer on four occasions over a couple of years. He alleged he *found* trash and debris on his trailer on twenty occasions. Another coworker testified he saw Hardy put trash in Carpenter's trailer approximately once a week. Other drivers played similar pranks on their coworkers. The misloading caused drivers delays in delivering their goods because they would have to backtrack on delivery routes and sometimes go to the same destination multiple times. One coworker stated Hardy "was constantly tormenting [Carpenter]." J.A. 261. Another coworker testified Carpenter was one of Hardy's favorite targets. On one occasion, Carpenter received a written reprimand for leaving a pallet-jack on a trailer, the apparent result of a prank.

Carpenter asserts Hardy's actions were motivated in part by Hardy's knowledge Carpenter had testified (along with three other CCX employees) in October 2000 in an employment discrimination action against CCX brought by Mark Langford, a former CCX employee. Carpenter's testimony in Langford's case implicated Paul Beckett, a CCX supervisor. Carpenter's supervisor, John McCutcheon, knew Carpenter had testified in Langford's case. Carpenter alleges his decision to testify in Langford's case fueled Hardy's animosity. According to Carpenter, another driver told him Hardy called him a "traitor" for testifying. J.A. 128. Carpenter testified he never told anyone in management at CCX about Hardy's "traitor" remark. Id.

-3-

Carpenter states he complained to McCutcheon about Hardy's pranks with the trailers seven to ten times during the four-year period from 2000 to 2004. J.A. 117. The first time he complained (in January or February 2001), he informed McCutcheon he felt Hardy was trying to get him fired in retaliation for his testimony in Langford's case. Carpenter states McCutcheon told him not to worry because anyone who testified was "in a glass shell," presumably meaning they could not be subjected to retaliation for their testimony. Id. Carpenter states McCutcheon did not take any action relating to Hardy.

In May 2004, Carpenter complained to the regional manager about trash on the trailers and other issues. Carpenter told the regional manager he believed Hardy was trying to get him fired, and he had heard Hardy was making racist comments. He also reported the comment made directly to Carpenter, "That's what you get for marrying those kind." J.A. 29. Carpenter stated: "I did not describe the other specific examples that had been told to me at that time because the driver who had relayed the comments was still employed by the company." Id. McCutcheon was also present at these meetings.

On August 20, 2004, Carpenter arrived at work. Hardy told him if he needed a pallet jack, he would find one on the trailer Carpenter had used the day before. When Carpenter arrived at the trailer, he found it full of plywood and garbage in addition to the pallet jack. As he cleaned it, Hardy and another employee drove by and threatened to report Carpenter for leaving his trailer dirty, and Carpenter and Hardy "had words." J.A. 94, 235. Carpenter testified he did not know if Hardy put the trash in his trailer.

Carpenter then went to see McCutcheon. Carpenter recalls his words to McCutcheon: "if he wasn't going to take care of this problem with Rick Hardy, that I was going to take a week's vacation and give him my week's notice because I was tired of dealing with it." J.A. 94. Carpenter reminded McCutcheon he had complained about Hardy's antics several times. McCutcheon responded if Carpenter

did not like the way things were run at CCX, Carpenter could leave his keys on McCutcheon's desk. McCutcheon then turned his back to Carpenter and ignored him. Id. Carpenter put his keys on McCutcheon's desk and McCutcheon said: "[D]on't call me back in a week begging for your job back." Id.

Later the same day, Carpenter called CCX's personnel manager and described the problems he had been having with Hardy. According to Carpenter, the personnel manager asked him if he wanted to keep his job and Carpenter responded yes three or four times. Carpenter states he told the personnel manager, "But if this treatment continues, I don't want my job." J.A. 125.

McCutcheon secured handwritten statements from a number of employees regarding Carpenter's last day of work. The personnel manager had Carpenter submit a written statement regarding his last day of work. Carpenter's statement makes no mention of racial discrimination or racial harassment. J.A. 53-54. On August 23, 2004, Carpenter met with McCutcheon and spoke by telephone with the personnel manager. Carpenter informed the personnel manager he would like to keep his job, but he no longer wanted the job if the treatment continued. The personnel manager later informed Carpenter he would not be allowed to rescind his resignation.

II

A. Race Discrimination

Carpenter recognizes the court should analyze his Title VII and ICRA discrimination claims using the three-pronged burden-shifting scheme first described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).[2] The first prong

_____

[2]Since Iowa courts "look to federal case law interpreting Title VII . . . for guidance in deciding cases under [the ICRA]," Bd. of Supervisors v. Iowa Civil Rights Comm'n, 584 N.W.2d 252, 254-55 (Iowa 1998), our analysis of Carpenter's federal

of the McDonnell Douglas scheme requires a plaintiff to present a prima facie case of discrimination. 411 U.S. at 802. To meet his burden of showing a prima facie case of discrimination under Title VII, a plaintiff must show (1) he is a member of a protected class, (2) he was meeting his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) "similarly situated employees outside the protected class were treated differently." Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir.), cert. denied, 126 S. Ct. 807 (2005).

"Just like any other discharge, a constructive discharge is an adverse employment action." Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 825 (8th Cir. 2006). "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing [him] to quit." Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004). To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit. Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005). A plaintiff may meet the second element by showing his "resignation was a reasonably foreseeable consequence of [his employer's] discriminatory actions." Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993).

Carpenter argues he was constructively discharged when McCutcheon stated, "If you don't like the way things are run around here, leave your keys on my desk." Appellant's Br. at 27. Carpenter contends this statement shows McCutcheon wanted him to quit or McCutcheon was giving him an ultimatum to, in effect, put up with the harassment or leave, and Carpenter's decision to quit was a reasonably foreseeable consequence of CCX's failure to address Carpenter's complaints about Hardy. We disagree.

claims applies with equal force to his ICRA claims.

It was Carpenter who stormed into McCutcheon's office and threatened to quit. It was Carpenter who, after being ignored by McCutcheon, turned in his keys. Even assuming Carpenter explained to McCutcheon that Hardy's conduct was in retaliation for Carpenter testifying in Langford's case, the actions of McCutcheon do not demonstrate an intent to compel his resignation. MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 928 (8th Cir. 2004) ("A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation."). The first time Carpenter complained to McCutcheon about Hardy's alleged retaliatory threats, McCutcheon stated Carpenter would be protected from retaliation for his testimony in Langford's case. In addition, McCutcheon implemented Carpenter's "dock clearing" crew idea which involved Carpenter and another employee rearranging freight so it would be in the right position in the trailers for deliveries. On another occasion, McCutcheon called a dock meeting and stated, as paraphrased by Carpenter, "Hey, look guys. Everybody needs to start treating people a little better around here." J.A. 118.

Nor was Carpenter's decision to turn in his keys a reasonably foreseeable consequence of CCX's failure to address Hardy's ongoing conduct. The conduct consisted of unreported racial epithets directed at Carpenter but not heard by Carpenter, one racial epithet directed to Carpenter about marrying a black woman, the placement of garbage in his trailer four to twenty times over two years, and the misloading of his trailer up to twenty times over four years. As for the trailer pranks, at least six other drivers for CCX had experienced similar harassment by Hardy and none of those drivers had resigned. Moreover, we find Hardy's racial slurs do not convert Carpenter's resignation into a constructive discharge. See, e.g., Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 910 (8th Cir. 2003) (concluding graffiti associated directly with plaintiff's name such as "coon," "all niggers must die," and "kill all niggers," the last of which was not removed after notice to the employer, was sufficient to survive summary judgment on a hostile work environment claim but not sufficient to show conditions so intolerable a reasonable person would have quit).

-7-

Given the above, Carpenter did not proffer evidence showing CCX should have foreseen he would quit.

As a result, Carpenter failed to show he suffered an adverse employment action and, thus, did not set forth a prima facie case of race discrimination.

B.  Hostile Work Environment

To establish a Title VII race-based hostile work environment claim, a plaintiff must show (1) he is a member of a protected group, (2) he is subjected to unwelcome race-based harassment, (3) the harassment was because of his membership in the protected group, and (4) the harassment affected a term, condition, or privilege of his employment. Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005).  A hostile work environment "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" as viewed objectively by a reasonable person. Tademe v. Saint Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003) (internal quotation omitted).  "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006) (citations omitted). "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Id. (quoting Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir.2003)).

Hardy's racial insults were not shown to be connected to Hardy's misloading of or placing garbage in Carpenter's trailer.  Carpenter testified Hardy "was an instigator to everybody" who "would instigate problems" such as "do[ing] things . . . intentionally" to "piss a driver off" and then run down the dock telling everybody he had just done something to someone's trailer. J.A. 98.  While Carpenter was a favorite target of Hardy's childish pranks, another employee testified Hardy played a practical

-8-

joke on somebody "about daily." J.A. 253. This evidence does not show objectively hostile conduct. See, e.g., Singletary, 423 F.3d at 892-93 (finding job environs where the plaintiff had second-hand knowledge his co-workers and some managers referred to him as a "nigger" and where his vehicle had been vandalized on several occasions not objectively severe and pervasive); Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004) (finding racial remarks, made directly to plaintiff, once a month for two years by owner and operators, was insufficient to render the workplace objectively hostile).

C.     Retaliation

To make a prima facie case of retaliation against an employer, a plaintiff must show (1) he engaged in protected conduct, (2) a reasonable employee would have found the challenged retaliatory action materially adverse, and (3) the materially adverse action was causally linked to the protected conduct. See Burlington N. and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2410-16 (2006); Higgins v. Gonzales, No. 06-2556, 2007 WL 817505, at *8 (8th Cir. Mar. 20, 2007) (discussing the elements of a retaliation claim after Burlington).

The challenged retaliatory action here is either Carpenter's constructive discharge or the employer's failure to rectify Hardy's behavior. As stated above, Carpenter was not constructively discharged. Thus, the question is whether CCX's failure to stop Hardy's conduct and comments was an act which would have dissuaded a reasonable worker from participating in a Title VII investigation or action involving CCX. We find Hardy's conduct not so severe and pervasive as to create a hostile work environment. The effect of the conduct more closely resembles the "trivial harms" identified in Burlington Northern and Santa Fe Railway Co. v. White which the Supreme Court found not actionable:

We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does

not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

126 S. Ct. at 2415 (internal quotations and citations omitted). Carpenter argues the misloading of his trailer and placing of garbage in his trailer was more than a trivial harm to him as it took longer to make his deliveries when such pranks occurred. But, at best, he alleges such conduct took place several dozen times over four years. This conduct which was not shown to be connected in any way to Hardy's racial slurs (most of which were never reported to management), does not rise beyond a trivial harm.

Finally, Carpenter did not show any causal connection between CCX's failure to correct Hardy's behavior and his participation in Langford's case. While CCX knew Carpenter had participated in Langford's case in October 2000 and McCutcheon knew in January or February 2001 Carpenter had alleged Hardy was threatening retaliation against Carpenter for his participation in the case, there is no evidence to suggest CCX failed to correct Hardy's behavior *because* Carpenter testified in Langford's case or to stymie any other employee from participating in any protected conduct.

III

Accordingly, we affirm the judgment of the district court.