# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1427

_____

Debra Anda,

        Appellant,

    v.

Wickes Furniture Company, Inc.,
a foreign corporation,

        Appellee.

Appeal from the United States
District Court for the
District of Minnesota.

_____

Submitted: November 13, 2007
Filed: February 19, 2008 (Corrected: 3/26/2008)

_____

Before MURPHY, HANSEN and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Debra Anda brought suit against Wickes Furniture Company ("Wickes") alleging sexual harassment based on a hostile work environment and constructive discharge. Wickes filed a motion for summary judgment, which the district court[1] granted. Anda appeals, and we affirm.

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

## I. BACKGROUND

In September 2001, Anda became a part-time, commissioned furniture salesperson at Wickes's Coon Rapids, Minnesota location. Anda was recruited to Wickes by Kathy Gargaro who had previously been Anda's supervisor at Home Life Furniture. When Anda began her job at Wickes, Gargaro was the store manager, Gary Victor was the sales manager and Jamie Lambert was the office manager. In May 2003, Dave Bruber replaced Gargaro as the store manager.

Shortly after Anda joined Wickes, Lambert gave her a copy of Wickes's Code of Business Conduct Manual ("Code") and its Workplace Harassment Policy ("Harassment Policy"). The Code stated that "it is the goal of Wickes Furniture Company, Inc. to provide a workplace free from unlawful and improper 'harassment' of employees by other employees or agents of the Company, or by its customers and vendors." The Harassment Policy described Wickes's policy against workplace discrimination, gave examples of harassing behaviors and the consequences for violating the Harassment Policy, and instructed employees who feel victimized by sexual harassment to immediately report the incident. Anda acknowledged she received these policies and was required to review them. Thereafter, Victor explained Wickes's open door policy to Anda. The open door policy allowed employees to report anything they found objectionable to any manager. Anda said that she interpreted the open door policy to mean that her "opinions count[ed] . . . [and she could] go to any of [her] supervisors to discuss any issues that may arise."

Anda worked with many salespeople at Wickes, including Ryan Carlson, Ernesto Flores, Derek Knott, Tim Mack and Julie Enga. Wickes's "up list" system allowed the salespeople to put their names on a list which determined the order the salespeople were assigned to assist customers. If a previous customer returned to the store, the original salesperson was to assist the returning customer.

Although Anda made several unspecified complaints about Carlson to Bruber during 2003, a series of events occurred in September 2003 that ultimately led to Anda giving her two-week notice of resignation. On September 6, Carlson accused Anda of stealing one of Enga's customers, and Anda called Carlson a "leviathan." Carlson believed "leviathan" meant devil, and he claimed to be upset by the comment. He did not go to work the next day and called Bruber to report the incident. When asked about the incident, Anda told Bruber that Carlson also made inappropriate comments to her, only specifying one comment Carlson made "about [her] butt a few days earlier." On September 9, Carlson formally accused Anda of harassment, complaining to Bruber about the "leviathan" incident, Anda's customer stealing and name calling, and Anda's comment to him to stay away from Enga. Bruber followed Wickes's corporate human resources department's instruction to issue a verbal reprimand to Anda. On September 15, Anda received the reprimand. At that time she told Lambert she intended to compile a list of allegations against Carlson.

On September 20, Anda provided her list of allegations about Carlson to Bruber. Anda wrote that she told Bruber on September 7 that Carlson was unable to "control his temper," had made "inappropriate comments on the sales floor" and had a "tendency to switch blame." She then listed eleven incidents occurring between July and September 2003. Three of the items involved the September 6 incident when Anda called Carlson a "leviathan." Two other incidents addressed arguments between salespeople about stealing customers. Three incidents involved gossip between salespeople. In the final three incidents, Anda alleged that Carlson made a comment about Anda and Enga using a "strap on," kicked Anda in the back of her leg, and said, "[L]arge butt, you must be talking about Deb." On September 21, Bruber again followed Wickes's corporate human resources department's instruction and issued a verbal reprimand to Carlson. He and Lambert then met with Anda to explain Carlson's reprimand.

On September 29, Lambert and Bruber held a staff meeting to address Wickes's policies for assigning salespeople to customers. After the September 29 meeting,

Anda gave Bruber her two-week notice of resignation. She told Bruber that Carlson was scaring her and saying she did not follow the rules for customer assignment. Bruber asked Anda not to quit and said that Carlson would not be working at Wickes much longer.

Later that day, Carlson approached Anda and a customer she was assisting and claimed that the customer was his. Anda continued to help the customer, and Carlson stated, in front of the customer, that she should turn over the customer over to him, saying that he would "kick [her] fucking ass" if she did not. After Anda finished with the customer, Anda reported the incident to Bruber. When Anda said she did not have any witnesses, Bruber said he would eventually catch Carlson acting inappropriately and discipline him.

On September 30, Anda called Lambert to tell her that she was not returning to Wickes to complete her final two weeks because of the September 29 incident with Carlson. Lambert told Anda that Wickes did not want to lose her as a salesperson and "that there was a process to [Carlson's] disciplinary actions and that it was only a matter of time."

In an October 3, 2003 letter to Dick Peterson, vice president of the corporate human resources department, Anda stated that she "enjoyed working with many of the people of Wickes, . . . had the privilege to work with some very hard working and dedicated employees, including Jamie Lambert and Dave Bruber, . . . [and] believe[d] that they have both tried to deal with these disciplinary actions regarding Ryan Carlson to the best of their abilities." Anda attached a description of the September 29 events and her September 30 phone conversation with Lambert.

Anda also talked with Alisa Schueneman, an employee in Wickes's corporate human resources department. She told Schueneman of her complaints concerning Carlson's behavior, and Schueneman said she would investigate. In an October 15, 2003 letter to Schueneman, Anda claimed that she previously told Lambert that

Carlson made a comment to Anda that "Jamie [Lambert] can lick my bunghole" and that Carlson told Flores and Enga to "[m]ake sure you use protection" as they left the store on September 17, 2003. On October 15, Wickes terminated Carlson's employment.

On March 11, 2004, Anda filed a charge of sex discrimination with the Minnesota Department of Human Rights ("MDHR"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). After receiving right to sue letters, Anda filed the instant federal suit alleging sex discrimination based on a hostile work environment and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act, Minn. Stat. § 363A.01 et seq.

During discovery in this lawsuit, Anda described a series of sexual harassment incidents involving numerous Wickes's employees that she had not reported to Wickes's management. Knott told Anda that he wanted to have sex with her daughter, asked her what she would do if she found her daughter in bed with two men, and said her daughter would enjoy that experience. Knott also told Anda that she was the same size as his wife and that he wanted to bend her over a sofa to see what it would be like to have sex with his wife on that sofa. On another occasion, Knott put Anda's head in his groin and said, "Blow me." Knott also would come towards Anda from behind and lift her in a bear hug. Knott and Carlson referred to Anda and Gargaro as "cunts" and "bitches." Flores called Anda the "virgin Mary" and "mother of God" because she told male salespeople that they said inappropriate things. He hugged Anda from behind, told her that her daughter was hot and jumped on her while she was sitting on a sofa and simulated having sex with her. Clark hugged Anda, grabbed her breast and said it was firm, jumped on top of her and told Anda that Enga was slutty. Mack made comments to Anda about her sex life and told Anda that Enga was loose and hot. He also complained that Wickes did not hire more attractive women. Bruber, the store manager, asked Anda if Enga was bisexual, told Anda that two women wanted to make a sandwich out of him at another Wickes store, and told Anda that he wrongly was written up for sexual harassment at that store.

The district court granted Wickes's summary judgment motion. It found that Anda's hostile work environment claim failed because she did not present sufficient evidence to create a genuine issue of material fact as to whether Wickes failed to take prompt and effective remedial action on her complaints about Carlson's conduct and whether Wickes knew or should have know of the incidents she had not reported to Wickes's management. The district court then determined that Anda's state law claim was barred by the statute of limitations because it was filed more than forty-five days after her receipt of the right to sue letter from the MDHR.[2] Finally, the district court found that Anda's constructive discharge claim failed because she did not present sufficient evidence to create a genuine issue of material fact as to whether Wickes deliberately created hostile working conditions and whether she gave Wickes a reasonable opportunity to remedy the alleged harassment.

## II.    DISCUSSION

"We review a district court's grant of summary judgment de novo, drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party." *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). "Summary judgment is appropriate if the facts, viewed in the light most favorable to the non-moving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005) (citing Fed. R. Civ. P. 56(c)).

In order to establish the existence of a genuine issue of material fact, "[a] plaintiff may not merely point to unsupported self-serving allegations." *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005). Instead, the plaintiff "must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor." *Id.* at 873. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting

---

[2]Anda does not appeal this holding by the district court.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[S]ummary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (quotation omitted).

## A.     Hostile Work Environment

As this court has previously discussed,

Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964. A hostile work environment arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Hostile work environment claims are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

To establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 549-50 (8th Cir. 2007) (internal quotations and citations omitted). After reviewing the record and drawing all reasonable inferences in favor of Anda, we find that Carlson's conduct about which Anda informed Wickes prior to her resignation did not rise to the level of severe or

pervasive conduct necessary to establish a hostile work environment claim. Even if it did rise to that level, Wickes took prompt and effective remedial action. Anda also did not establish a genuine issue of material fact as to whether Wickes knew or should have known about the sexual harassment incidents that she had not reported to Wickes's management.

Turning first to what Wickes knew at the time of Anda's resignation, Anda made several unspecified complaints to Bruber about Carlson's behavior during 2003 and provided Bruber a letter on September 20, after the September 6 incident, that listed eleven complaints, most of them non-sexual in nature and referring to arguments over customers and gossip between salespeople. Her letter also included complaints about the incident when Anda called Carlson a "leviathan" and other incidents when Carlson commented on whether Anda and Enga used a "strap on," kicked Anda in the back of her leg, and said that Anda had a large butt. These isolated comments, only two of which have any sexual overtones, do not establish a genuine issue of material fact as to whether the workplace was so permeated with discriminatory conduct that a hostile work environment under Title VII existed. *See Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 619 (8th Cir. 2007) (stating that "Title VII . . . does not set forth a general civility code for the American workplace") (quotation omitted).

Even if these allegations rose to the level of sexual harassment, Wickes took prompt and effective remedial action to address Anda's complaints. On September 21, Bruber issued a written reprimand to Carlson. On September 30, Lambert told Anda that Wickes did not want to lose Anda as an employee and that the process of investigating and disciplining Carlson was ongoing. Wickes then terminated Carlson's employment on October 15. Because the undisputed evidence shows that Wickes dealt with Anda's specific complaints about Carlson in a prompt and effective manner, Anda does not raise a material question of fact as to whether Wickes failed to take prompt and effective remedial action.

Beyond Anda's complaints about Carlson, the record is void of any evidence that Anda reported the alleged incidents of sexual harassment between herself and Knott, Flores, Clark and Mack to Wickes before she resigned on September 29. Instead, Anda argues that Wickes knew of the unreported incidents because Bruber, the store manager, sexually harassed her with his question about Enga's sexual preference and his comments that two women at another Wickes store wanted to make a sandwich out of him and that he wrongly was written up for sexual harassment. She claims that these statements by a manager imputed knowledge of all of the other harassing incidents to Wickes. First, these statements are not evidence that Bruber knew of the incidents involving Knott, Flores, Clark and Mack. Second, Bruber's statements were not directed at Anda and do not rise to the level of severe or pervasive conduct necessary for a hostile work environment claim. *See Vajdl*, 484 F.3d at 550. Furthermore, in her October 3 letter to Peterson, Anda does not give any indication that she felt harassed by Bruber. Instead, Anda wrote that she "had the privilege to work with some very hard working and dedicated employees, including . . . Dave Bruber." Therefore, these isolated comments by Bruber are not sufficient evidence that Anda was subjected to a hostile work environment and do not impute knowledge to Wickes of the harassing conduct by Knott, Flores, Clark and Mack.

Anda next argues that Wickes should have known of the full extent of the alleged harassing conduct that she had not reported to Wickes's management. She contends that Bruber's statement in his deposition that he would have seen the alleged acts if they had occurred creates a genuine issue of material fact concerning whether Wickes should have known about the conduct. However, when that response is put in context, it becomes apparent that Bruber simply was denying any knowledge of the unreported incidents.

> Q:    [Y]ou told me for the most part that you didn't see [what Anda alleges] and as far as you knew, you never heard about anything like that and Ms. Anda never complained about any of those things; right?

Bruber:     Yes.

Q:          And it is fair to say that those allegations are referenced behaviors that are not what you experienced at Wickes; right?

Bruber:     Correct.

* * *

Q:          Nothing like that ever occurred as far as you know?

Bruber:     Correct.

Q:          But let me ask you this: I mean from the fact that you would be typically out on the floor, I assume that other managers, that's what they are supposed to do, also be out on the floor making sure customers are being served?

Bruber:     There were different levels, yes.

Q:          Would you agree with me that if that stuff was happening, it would be hard not to notice that stuff?

Bruber:     Yes.

Bruber's Deposition at 96-97. We fail to see how Bruber's response of "yes" shows that he should have known of the unreported incidents when he just finished testifying that he did not see them. The only reasonable inference to be drawn from Bruber's statement, without resorting to speculation, is that he was confident that the incidents did not occur because he thought he would have noticed them had they occurred. *See Johnson*, 424 F.3d at 810. Even if we were to make the unreasonable inference that his statement shows that Wickes should have known about the alleged incidents as urged by Anda, Bruber's statement would at best amount to a mere scintilla of evidence to support Anda's position and, by itself, is insufficient for a reasonable jury

-10-

to conclude that Wickes should have known of the incidents that Anda failed to report to Wickes's management. *See Bass*, 418 F.3d at 873.

Anda next argues that Wickes had a rule requiring a complaining employee to have two witnesses before bringing a complaint to management (the "two-witness rule") and that this rule demonstrates that Wickes should have known about the conduct because the rule discouraged employees from reporting sexual harassment. Even if such a rule could be used to prove that Wickes should have known about the unreported incidents, Anda fails to provide sufficient probative evidence to support the existence of this rule. First, she testified that Gargaro told her about the rule while they both worked at Home Life Furniture, a different company. A rule of another company is not evidence that the same rule exists at Wickes. Anda also testified that salespeople at Wickes's other store locations told her that their managers told them about the rule. This testimony is inadmissible hearsay that Anda cannot use to avoid summary judgment. *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 480 (8th Cir. 2004).

Anda argues that the existence of the two-witness rule also is supported by Bruber's response to her September 29 complaint about Carlson when he asked if she had any witnesses of the incident. This single question does not provide sufficient probative evidence to raise a material question of fact that Wickes adhered to a two-witness rule. Additionally, Anda's vague, self-serving allegations that managers told the salespeople to work out their problems by themselves and not to report incidents unless they had a witness is not sufficient to support the existence of a two-witness rule that discouraged salespeople from reporting problems to Wickes. *See Bass*, 418 F.3d at 872-73. Instead, the evidence demonstrates that Wickes had both a Code and Harassment Policy that prohibited harassment and required employees to report it to management. Neither the Code nor the Harassment Policy identified a two-witness rule. Anda acknowledged receiving these policies and her duty to review them. Anda was also aware of Wickes's open door policy allowing its employees to report

complaints at any time. Indeed, Anda made several vague complaints to Bruber about Carlson during 2003. We conclude that Anda did not present sufficient probative evidence to create a material question of fact as to whether Wickes followed a two-witness rule that discouraged her from reporting incidents of sexual harassment.

With respect to the unreported incidents of sexual harassment, Anda did not provide sufficient probative evidence to raise a material question of fact as to whether Wickes knew or should have known about the incidents and failed to take prompt and effective remedial action. As for the incidents known to Wickes's management, they do not rise to the level of severe or pervasive conduct necessary for a hostile work environment claim, and Wickes took prompt and effective remedial action with respect to Carlson. Therefore, the district court correctly held that Anda did not establish a prima facie case of a hostile work environment and granted summary judgment to Wickes.

### B.    Constructive Discharge

"To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." *Carpenter*, 481 F.3d at 616. "An employee must, however, grant [her] employer a reasonable opportunity to correct the intolerable condition before [she] terminates [her] employment." *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 724 (8th Cir. 2003) (quotation omitted).

Anda's constructive discharge claim fails because Anda provided no evidence that Wickes intended to force Anda to quit. Instead, when Anda gave Bruber her two-week notice of resignation, Bruber asked her not to quit. Lambert also asked Anda to stay at Wickes and expressed disappointment when Anda told Lambert she was not returning to work. Anda's own letter to Peterson after she quit also supports the finding that her supervisors did not intent to force Anda to quit. She wrote that she

"believed that [Lambert and Bruber] have both tried to deal with these disciplinary actions regarding Ryan Carlson to the best of their abilities." Without some evidence that the managers at Wickes did not want Anda to continue to work at Wickes, Anda has failed to create a genuine issue of material fact sufficient to support a conclusion that Wickes intended to force Anda to quit.

Furthermore, Anda did not give Wickes a reasonable opportunity to correct the intolerable working conditions she alleged in her deposition. Wickes clearly did not know the full extent of Anda's complaints regarding the other salespeople when she resigned on September 29. Anda had only complained about Carlson's behavior, and Wickes took action concerning those complaints. Without any knowledge of the unreported incidents, Wickes did not have a reasonable opportunity to correct the intolerable conditions detailed in Anda's deposition.

Because Anda has failed to create a material question of fact as to whether Wickes intended to force her to quit and failed to grant Wickes a reasonable opportunity to correct the situation, we agree with the district court that Anda failed to establish constructive discharge.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to Wickes.

_____