# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2041

_____

Zachary Winspear,                   *
                                       *

         Appellant,       *
                                         *    Appeal from the United States
   v.                          *    District Court for the
                                         *    District of Minnesota.
Community Development, Inc.,      *
Charles Schneider, and Lana Sierra,    *
                                         *

         Appellees.       *

_____

Submitted: November 14, 2008
Filed: July 29, 2009

_____

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Zachary Winspear appeals a district court's adverse grant of summary judgment dismissing his employment discrimination claim against Community Development, Inc. ("CDI"). We reverse and remand for further proceedings.

I.

"We review a district court's grant of summary judgment de novo. . . . viewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all inferences that may reasonably be drawn." Jackson v. United Parcel

<u>Serv., Inc.</u>, 548 F.3d 1137, 1140 (8th Cir. 2008) (internal citation and quotations omitted).

Winspear began working at CDI in March 2003. Approximately four years prior to Winspear's employment at CDI, Winspear's brother, Logan, had committed suicide. Winspear had been close to Logan. He refers to Logan as his best friend and only "real" family member. His close relationship with Logan was due in part to the brothers' difficulties with their strict religious upbringing and their respective rejections of organized religion. Winspear spent years grieving for his brother and was nearly incapacitated by his brother's suicide. Winspear became so distraught that he contemplated suicide himself.

When Winspear started with CDI in 2003, he was a personal assistant to Charles Schneider, a co-owner of CDI. Winspear had a close working relationship with Schneider, they spent significant time working together, and they often discussed their personal lives. Winspear even confided in Schneider about Logan's suicide and the devastating emotional impact it had on him. While Winspear was at CDI, he received multiple promotions and ultimately served as CDI's community manager.

In January 2005, CDI hired Schneider's wife, Lana Sierra, as a receptionist. Winspear and Sierra had known each other through Schneider, and Sierra was aware of Winspear's background, his troubled history with religion, and his brother's suicide. One morning in late-January 2005, Sierra approached Winspear at work and asked to speak with him privately. Winspear and Sierra stepped into an empty office where Sierra hugged Winspear and proceeded to cry. Sierra told Winspear that she had the ability to speak with the dead and that she had been communicating with Logan. She told Winspear that Logan wanted her to pass messages to him because Logan had been trying to contact Winspear, but Winspear had not been listening. She told Winspear that Logan had said that he was suffering in hell and that Winspear would also go to hell if he did not "find God." Winspear became very upset and asked

Sierra not to speak about his brother. He then returned to his office where he sat and cried for an extended period of time. Throughout the rest of that day, Sierra repeatedly spoke to Winspear about her "gift" of speaking to the dead, hugged Winspear, and told Winspear that she wanted to help him. Winspear told Sierra that she was crazy, he did not believe her, and she needed to stop. Nevertheless, Sierra continued to tell Winspear that he needed to "find God" so that he would not go to hell like Logan.

Over the next three-and-a-half weeks, Sierra, on a daily basis, repeatedly hugged Winspear, talked to him about Logan, and asked him if he had looked into communicating with the supernatural or finding God. Winspear frequently asked Sierra to stop, but Sierra continued to speak to Winspear about Logan, encourage Winspear to research the supernatural, and invite him to church. When Winspear failed to demonstrate sufficient interest, Sierra's demeanor grew more demanding, causing Winspear to become increasingly uncomfortable at work. Winspear began staying in his office during working hours just to avoid Sierra. After work, he would go home, contemplate suicide, and cry himself to sleep because Sierra's behavior caused him to relive the traumatic experience of his brother's suicide.[1]

---

[1] The dissent makes note of the fact that Winspear stated the conduct continued for four-to-five months, which contradicted his earlier statement that the harassment was daily for three-and-a-half weeks. With due respect to the dissent, even if the harassment did cease entirely after three-and-a-half weeks, three-and-a-half weeks of daily harassment may be sufficiently pervasive to withstand summary judgment. It is not only the number of occasions, but the severity of the conduct—playing into Winspear's expressed grief over his brother's suicide—that courts must consider. See O'Brien v. Dep't of Agric., 532 F.3d 805, 809 ("Hostile work environment claims are assessed based on the totality of the circumstances . . . ."); Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 911 (8th Cir. 2006) ("Frequency of harassment is a factor, but even infrequent conduct can be severe enough to be actionable.").

After approximately three weeks of Sierra's behavior, Winspear spoke with Schneider about Sierra, even though Winspear feared repercussions at work for complaining about Schneider's wife. Schneider, however, merely confirmed to Winspear that Sierra could communicate with the dead, advised Winspear to heed Sierra's advice, and told Winspear to keep Sierra's gift secret.

Within a few days of Winspear speaking with Schneider, Winspear admits that Sierra's direct daily harassment subsided such that she stopped speaking to him about his brother specifically. Nonetheless, Sierra continued to ask Winspear if he had given any more thought to what they had talked about. Winspear spoke with Schneider about Sierra again, but Schneider reiterated that Winspear should listen to Sierra because she had "a gift." Schneider's refusal to remedy the situation left Winspear crushed.

By March 2005, Winspear admits that Sierra almost completely stopped her behavior, but she still continued to ask Winspear about finding religion every one to two weeks over the next five months. During that time frame, Sierra once told Winspear that she was frustrated with him because Logan was still trying to contact him. She also told Winspear that he needed to find God so that Logan would stop bothering her. These comments humiliated Winspear and caused him to lose any remaining enjoyment in his job. He became so preoccupied with avoiding Sierra at work that he came to and left work at odd hours, sought opportunities to leave the building during working hours, and, while at work, avoided leaving his office to interact with others or even to use the bathroom. He became temperamental, distant from other co-workers, and unable to concentrate on his work.

In August 2005, Sierra and Winspear had a heated confrontation at work over a comment Winspear made about Sierra's former boss, a chiropractor with whom Winspear was having a billing dispute. Winspear left work after the confrontation.

CDI notified Winspear that he needed to return to work because he did not have permission for time off. Rather than return, Winspear quit his job.

After exhausting his administrative remedies, Winspear subsequently sued CDI, Schneider, and Sierra in federal district court. Among other claims, Winspear alleged that he was subject to religious-based hostile work environment discrimination, in violation of federal law. CDI, Schneider, and Sierra moved for summary judgment, which the district court granted for each of Winspear's claims. Winspear appeals the district court's summary judgment decision dismissing his federal hostile work environment claim against CDI.

II.

On appeal, Winspear argues that the district court applied an incorrect standard when evaluating his federal hostile work environment claim. He contends that the district court treated his claim as one for constructive discharge and required him to show elements not essential to establishing that he suffered hostile work environment discrimination. Applying an appropriate analysis, Winspear claims that there are genuine issues of material fact as to whether he was subject to hostile work environment discrimination. CDI argues that Winspear's claim was for constructive discharge and that, regardless, summary judgment was appropriate.

Hostile work environment and constructive discharge claims may be wholly distinct causes of action under Title VII. See O'Brien, 532 F.3d at 809–11 (analyzing hostile work environment and constructive discharge claims separately, even where the claims were based on the same alleged conduct). The claims have different elements, see Anda v. Wickes Furniture Co., 517 F.3d 526, 531–32, 534 (8th Cir. 2008), and, while a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a

"tangible employment action," see Pa. State Police v. Suders, 542 U.S. 129, 143 (2004).

Count One of Winspear's Complaint against CDI alleges that "Defendant CDI violated Title VII of the Civil Rights Act of 1991 by creating a hostile work environment for [Winspear] on the basis of religion and by failing to take prompt remedial action to correct the hostile work environment." As a factual basis for this charge, it incorporates the Complaint's factual allegations, which relate almost exclusively to Sierra's conduct between January and August 2005. The Complaint itself does not allege constructive discharge—much less contain the words "constructive discharge"—and the only factual allegation in the Complaint related to Winspear's resignation states, "In August 2004 [sic] plaintiff resigned his employment with CDI."

CDI argues, however, that Winspear made a subsequent sworn declaration that changed his pleadings such that his hostile work environment claim became a claim for constructive discharge. Specifically, CDI claims that in Winspear's response to CDI's motion for summary judgment, Winspear filed a statement in which he said that he quit his job "to escape the religious and other harassment by Sierra." CDI argues that this statement demonstrates that Winspear truly alleges constructive discharge based on a hostile work environment. We disagree with CDI's contention.

The Federal Rules of Civil Procedure contain specific rules that plaintiffs must follow to amend their pleadings. See Fed. R. Civ. P. 15. Under these Rules, plaintiffs have one opportunity before trial to amend their complaints freely within a limited time period. Id. at 15(a). Thereafter, they must obtain the opposing party's or the court's permission before amending their complaints. Id.

Here, there is nothing in the record showing that Winspear made any effort to amend his pleadings pursuant to the Federal Rules of Civil Procedure. There is also

nothing indicating that CDI consented to such an amendment or that the district court granted Winspear permission to make such an amendment. Moreover, CDI cites no authority for the proposition that Winspear's conduct sufficed to amend his Complaint outside of the Federal Rules of Civil Procedure.

Furthermore, even if we indulged CDI's argument that Winspear did somehow amend his pleadings, the most we would be able to say from the record is that Winspear made a constructive discharge allegation in addition to, not in lieu of, his original hostile work environment claim. Winspear at no point in this matter abandoned his original hostile work environment claim, and he specifically supported that claim in his Complaint, in the above-referenced sworn declaration, in his response to CDI's motion for summary judgment, and on appeal. Thus, regardless of whether Winspear at some point raised a constructive discharge claim, his original hostile work environment claim remained at all times a properly alleged part of this lawsuit, and we agree that his claim must be analyzed accordingly.

A review of the district court's summary judgment order reveals, however, that the court did not reach a specific finding as to whether Winspear suffered hostile work environment discrimination. While the court recognized that "Winspear may have raised a genuine issue of material fact as to whether Sierra's repeated comments about Winspear's brother suffering in Hell and about Winspear needing to find God constituted a hostile work environment," Winspear v. Cmty. Dev. Inc., 553 F. Supp. 2d 1105, 1108 (D. Minn. 2008), it resolved Winspear's claim by stating that "[t]he four- to five-month lapse in time between when Sierra allegedly stopped harassing Winspear and when he resigned [was] fatal to his constructive discharge claim," id.

Based on our conclusions above, the district court's analysis of Winspear's hostile work environment claim was erroneous because it treated the claim as one for constructive discharge, requiring elements unnecessary to resolving Winspear's hostile work environment claim. Because the district court did not reach a specific

finding on this issue but indicated that Winspear may have suffered hostile work environment discrimination, we remand to the district court to address this issue in the first instance.

## III.

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

BOWMAN, Circuit Judge, concurring.

I agree that Winspear raised a stand-alone hostile-work-environment claim in his complaint and that the District Court should have addressed it in ruling on CDI's motion for summary judgment. I also agree that remand is required for the District Court to consider the question in the first instance. I write separately to emphasize my view that the remand is more than a legal formality. I read the District Court's comment in its order that "Winspear *may* have raised a genuine issue of material fact" (emphasis added) on the question of a hostile work environment as acknowledging the possibility of a legally cognizable claim, not the certainty of one. In fact, I may ultimately agree with the dissent's legal conclusion in this case. But I believe it is within the province of the District Court to consider in the first instance, with the benefit of the full summary judgment record and using the correct legal analysis, whether Winspear has raised a triable fact question on his hostile-environment claim.

SMITH, Circuit Judge, dissenting.

I agree with the majority's determination that Winspear asserted a hostile work environment claim independent of a constructive discharge claim. But I dissent from its holding that genuine issues of material fact remain as to whether Winspear was subject to hostile work environment discrimination based on his religious beliefs.

-8-

Viewing the evidence in the light most favorable to Winspear, the alleged harassment did not affect a term, condition, or privilege of Winspear's employment.

"Title VII [] prohibits an employer from subjecting its employees to a hostile work environment because of such individual's race, color, religion, sex, or national origin." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (internal quotations and citation omitted).

> To establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that [he or] she was a member of a protected group;[2] (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and [his or] her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

---

[2]"Title VII has [] been found to encompass situations in which an employee suffers an adverse employment action because he or she does not conform to the religious expectations of his or her employer." *Sarenpa v. Express Images, Inc.*, No. Civ. 04-1538, 2005 WL 3299455, at *3 (D. Minn. 2005) (unpublished) (citing *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 550–51 (8th Cir. 2002) (upholding jury verdict finding that employee was constructively discharged because she was not a Christian); *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) (recognizing Title VII claim that employee was discharged because she did not measure up to her supervisor's religious expectations); *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) ("Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs."); *Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228 (W.D. Ark. 2002)). In such a "non-adherence" case, "the 'protected class' showing required in a traditional race or sex discrimination case does not apply . . . because 'it is the religious beliefs of the employer, and the fact that [the employee] does not share them, that constitute the basis of the [religious discrimination] claim.'" *Noyes v. Kelley Serv.*, 488 F.3d 1163, 1168–69 (9th Cir. 2007) (quoting *Shapolia*, 992 F.2d at 1038) (alterations, in part, in *Noyes*).

*Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]tandards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* (internal quotations and citation omitted).

As noted *supra*, the fourth element of the prima facie case requires the plaintiff to prove that the "harassing conduct subjectively and objectively affected a term, condition, or privilege of employment." *Vajdl*, 484 F.3d at 551. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). An employer violates Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotations and citation omitted). "We can determine 'whether an environment is 'hostile' or 'abusive' . . . only by looking at all the circumstances[,which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Al-Zubaidy*, 406 F.3d at 1038 (quoting *Harris*, 510 U.S. at 23) (alterations in *Al-Zubaidy*).

Here, Winspear's proof does not establish that the harassment affected a term, condition, or privilege of employment. First, as to the frequency of the conduct, Winspear admits that "[a]fter about three[-]and[-]a[-]half weeks of this pretty ongoing deal, Lana's direct daily harassment *somewhat subsided* and it became an *occasional* have you thought any more about the religion-type of question she would ask me." Winspear Deposition at 111 (emphasis added). Thus, according to Winspear, the

conversations between he and Sierra started around January 31, 2005, and continued on "almost [a] daily basis" for "approximately three[-]and[-]a[-]half weeks." *Id*. at 112. When asked during his deposition whether Sierra kept talking to him on a daily basis after that time, Winspear responded, "Like I said. For a few days." *Id*. at 113. When asked whether "[i]t went away," Winspear stated, "*It went away almost completely in mid to late March 2005.*" *Id*. (emphasis added). Subsequently, when Winspear was asked whether Sierra would approach him on a "daily basis" and ask him if he had thought any more about finding a religion and attending church with her, Winspear responded, "*After the middle of March, it happened approximately one to two weeks.*" *Id*. at 136 (emphasis added). Even in his complaint, Winspear stated that "Sierra's harassment of plaintiff continued, *but eventually ceased.*" Appellant's Appendix at 27 (emphasis added).

Not until Winspear filed his declaration in opposition to CDI's motion for summary judgment did Winspear aver that

> *[o]ver the final 4–5 months of my employment at CDI*, I experienced ongoing pressure from Sierra to choose a religion, to look into finding God, fixing my life, and researching the supernatural. Although Sierra's direct references to Logan had subsided, her *constant pressure* on me to find religion reminded me of all of the horrible things that Sierra had said about Logan, his suffering in Hell, and my inability to contact him because I had not found religion. In light of the *ongoing harassment*[,] Schneider's refusal to remedy the situation[,] and in fact condoning Sierra's behavior, I lost hope for my job.

(Emphasis added.)

But a plaintiff "cannot create an issue of material fact merely by contradicting [his] earlier statements." *Planned Parenthood of Minn./S.D. v. Rounds*, 372 F.3d 969, 973 (8th Cir. 2004). The district court found, and the record demonstrates, that Sierra's daily comments about Winspear's need to find God only lasted three-and-a half weeks

-11-

in 2005. Thereafter, the comments were only occasional. Furthermore, in his complaint, Winspear admitted that Sierra's conduct "eventually ceased." Winspear waited four to five months between when Sierra allegedly stopped harassing him before he resigned in August 2005. *Cf. Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715–16 (3d Cir. 1997) (seven-month gap between harassing incidents allowed effects of prior incidents to dissipate).

Second, we have *rejected* hostile work environment claims in circumstances potentially more offensive than the present case. *See, e.g.*, *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933–34 (8th Cir. 2002) (finding five harassing incidents—including a relationship proposition, improper touching, a request that plaintiff draw a sexually objectionable picture, and posting of offensive posters—did not meet the standard necessary to be actionable); *Tuggle v. Mangan*, 348 F.3d 714, 722 (8th Cir. 2003) (holding that although the plaintiff "was clearly subjected to harassing conduct," it was not "actionable conduct" where a coworker made a number of comments based on the plaintiff's sex and posted a photograph showing the plaintiff's "clothed rear end"); *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 760 (8th Cir. 2003) (concluding that the district court erred in finding a triable issue for the jury where the conduct consisted of belittling and sexist remarks on almost a daily basis); *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (holding sexual harassment claim failed where a coworker grabbed the plaintiff's buttock and then confronted her about it the next day); *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 977–78, 980 (8th Cir. 2003) (concluding the coworker's conduct was inappropriate, but not sufficiently severe or pervasive, where it included calls to the plaintiff's home, frequent visits to her office, discussions about relationships (not including sexual details) with his wife and other women, touching the plaintiff's arm, saying he "loved" her and she was "very special," placing romance novels in her faculty mailbox, and invading her personal space).

Third, Winspear does not maintain that Sierra's alleged harassment occurred in front of others in an attempt to ridicule or demean him. In fact, the record demonstrates that Sierra always relayed her comments to Winspear in private and not around other coworkers. Sierra and Schneider even urged Winspear not to tell others about Sierra's "gift" as a clairvoyant. While understandably offensive, the record reflects the conduct probably resulted from a misguided attempt to help Winspear rather than harass him and negatively impact his job status or job performance.

Finally, as to whether Sierra's harassment unreasonably interfered with Winspear's work performance, Winspear asserts in his brief that, after Sierra's "harassment" began

> Winspear dreaded going into the office. He was overloaded with work as it was, but he could not concentrate on anything. Winspear would leave work at CDI and go right to bed, only to lie there for hours in solitude considering suicide and crying himself to sleep.
>
> When Winspear was at work, he would hide out in his office trying to stay professional, but feeling overwhelmed and humiliated. It got to the point where he would try to avoid even going to the bathroom or break room because he knew that Sierra would inevitably have more comments about Logan or religion. Winspear tried to enter and exit the office at times when he thought he might not run into Sierra. He felt trapped in the office—looking for any excuse to go to an off-site meeting or perform a neighborhood inspection. Winspear kept his office door closed as much as possible. Whenever someone came to the door, he feared it was Sierra. Winspear became distant and short-tempered. He spent the entire week counting down the hours to the weekend and then spent the weekends dreading returning to work on Monday morning.

Appellant's Brief at 13–14.

Winspear alleged that Sierra's harassment affected him at work, but he acknowledged that he was already "overloaded" at work before the harassment began. He also made no allegation that he could not complete his work or that he received discipline for performance deficiencies.

Reviewing the facts in the light most favorable to Winspear, I conclude that he has failed to demonstrate conduct so severe or pervasive as to create an objectively hostile or abusive work environment. Accordingly, I would affirm the judgment of the district court.

_____