PHYSICIANS MUTUAL INSURANCE COMPANY, APPELLEE, V. BETTIE SCOTT, APPELLANT.

439 N.W.2d 72

Filed April 27, 1989.   No. 87-413.

948

Robert V. Broom, of Broom and Johnson, for appellant.

A. Stevenson Bogue and Patrick J. Barrett, of McGrath, North, O'Malley & Kratz, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Claiming she was fired as a result of racial discrimination, Bettie Scott, a black woman, appeals a Douglas County District Court ruling that the termination of her employment at Physicians Mutual Insurance Company in Omaha was

nondiscriminatory. We affirm the district court ruling.

Originally, the appellant filed a complaint with the Nebraska Equal Opportunity Commission (NEOC). The NEOC found in Scott's favor, ordered Physicians Mutual to pay past and future wages, pay attorney fees, and reinstate Scott to her employment. Additionally, the NEOC ordered Physicians Mutual to

> "cease and desist its practice of allowing its supervisors unfettered discretion to exercise subjective judgments in regard to the disciplining of its employees and be required further, to promulgate objective standards . . . so that [Physicians Mutual] supervisors and employees, alike, may know what actions will result in disciplinary actions being taken."

Physicians Mutual appealed to the Douglas County District Court, where the NEOC order was vacated and set aside. Scott then appealed to this court. She claims the district court erred in (1) finding that Physicians Mutual met its burden of proving that Scott's termination was for legitimate nondiscriminatory reasons and that disparate treatment did not exist, (2) finding that Physicians Mutual's reason for terminating Scott was not merely pretextual, (3) failing to give appropriate deference to the credibility findings of the NEOC hearing examiner, (4) failing to apply the correct legal analysis in assessing and evaluating the evidence, and (5) giving weight to certain irrelevant facts and evidence and in failing to give proper weight to probative facts.

This court reviews NEOC disparate treatment cases de novo on the record. *Lincoln County Sheriff's Office v. Horne*, 228 Neb. 473, 423 N.W.2d 412 (1988); *Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987).

The legal theory under which appellant attempts to prove her case is one of disparate treatment, i.e., the appellee, because of appellant's race, intentionally treated her less favorably than other similarly situated employees and thereby discriminated against the appellant. See, *Payne v. ICG R.R.*, 48 Fair Empl. Prac. Cas. (BNA) 80 (W.D. Tenn. 1987); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.

248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

In an individual case of discrimination based on the disparate treatment theory, the employee alleging disparate treatment first has the burden of proving a prima facie case. If the employee succeeds, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the treatment of the employee. If the employer carries this burden, the employee must then prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Lincoln County Sheriff's Office v. Horne, supra*; *Father Flanagan's Boys' Home v. Goerke, supra*; *McDonnell Douglas Corp. v. Green, supra*.

While *McDonnell Douglas* was a hiring case, its four factors for establishing a prima facie case have been extended to discharge situations. See *Texas Dept. of Community Affairs v. Burdine, supra*, a gender discrimination case.

A prima facie case of a racially motivated discharge may be established when (1) the employee is a member of a protected minority; (2) the employee was qualified for the job from which he or she was discharged; (3) the employee was discharged; and (4) after the employee's discharge, the position was filled by a member of an unprotected class. See, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976); *McDonnell Douglas, supra*; *Gray v. Frito-Lay, Inc.*, 35 Fair Empl. Prac. Cas. (BNA) 598 (S.D. Miss. 1982); *Marks v. Prattco, Inc.*, 607 F.2d 1153 (5th Cir. 1979). These guidelines are not always rigidly applied, but are sometimes used as a method of evaluating the evidence in disparate treatment cases. See, *Texas Dept. of Community Affairs v. Burdine, supra*; *Payne v. ICG R.R., supra*; *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983); *Beaven v. Com. of Ky.*, 783 F.2d 672 (6th Cir. 1986).

"[T]he prima facie case focuses upon the primary factual inquiries of any disparate treatment case: ' "[whether] the defendant intentionally discriminated against plaintiff" ', and whether the employer treats people less favorably than others because of race, color, religion, sex or national origin." (Citations omitted.) *Beaven v. Com. of Ky., supra* at 675. (A

prima facie case was established where the plaintiff presented evidence that he belonged to a protected class, had performed his job satisfactorily until his firing, and was dismissed from his job.)

Both the NEOC and the district court found that Scott established a prima facie case of discrimination. The district court also found that Physicians Mutual articulated a legitimate, nondiscriminatory reason for the discharge. The NEOC found that the reason for the discharge was a pretext for racial discrimination.

Using the *McDonnell Douglas* guidelines for evaluating the evidence, we find that Scott was (1) a member of a protected minority and (2) discharged from employment with Physicians Mutual. Still applying the *McDonnell Douglas* method of evaluating the evidence, we also find that Scott was not satisfactorily performing her job for a period of time before and at the time of her discharge and that Scott's position was filled by a member of the same protected class of which Scott was a member.

A number of cases hold that an employee's poor performance may preclude the employee from establishing that the employee was qualified for the position at the time of the employee's discharge. See, *Bell v. Fremar Corp.*, 36 Fair Empl. Prac. Cas. (BNA) 547 (D.D.C. 1984) (black employee terminated for lack of requisite interest in and personality for job and for failure to perform job duties); *Silvas v. Dow Chemical Co.*, 36 Fair Empl. Prac. Cas. (BNA) 105 (S.D. Tex. 1984) (Mexican-American female terminated for poor performance was not discharged for racially or sexually motivated reasons); *Jacobs v. Bolger*, 587 F. Supp. 374 (W.D. La. 1984), *aff'd* 759 F.2d 20 (5th Cir. 1985) (black male terminated for inordinate tardiness and undependable work record); *Sack v. Kimberly-Clark Corp.*, 33 Fair Empl. Prac. Cas. (BNA) 624 (E.D. Wis. 1982) (age discrimination case).

It is the contention of Physicians Mutual that the sole reason for Scott's discharge was her poor job performance.

At the time Scott was terminated from her employment with Physicians Mutual she was an informal team leader of a six-person crew working the third shift in the mail-processing

center. She was moved into the position at her own request. The crew, consisting of four black employees and two white employees, operated on a team concept. While Scott worked on the third shift, Thomas McCarthy was her supervisor.

The night Scott was terminated, she was working in the presort division of the mail center. She was boxing the mail. According to McCarthy, under certain conditions, a boxer has the responsibility to help band the mail. McCarthy testified that on the night Scott was fired, the boxer should have also banded the mail. This was because one of the other presort workers had only been on the machine a few times and the machine was automatically shutting off due to mail stacking in the mail trays, McCarthy testified. This stacking of mail occurred when the mail was not getting banded. Scott claims that she was both boxing and banding that night. She stated that some of the mail could be put into the boxes without banding. She testified that she was doing her fair share of the work.

McCarthy's observation of Scott, as reflected in an October 10 memo to Scott's file, states that Scott "did not help out and do any banding at all, therefore, the feeder operator was feeding and banding . . . the other person banding was inexperienced and had to do more than could be expected."

Physicians Mutual's policy allowed each individual supervisor discretion in determining what formal or informal disciplinary steps were appropriate to discipline employees. Supervisors had been informed that the following types of discipline were to be used: (1) verbal warnings, (2) written warnings, (3) probation, and (4) termination. The disciplinary measure to be used in individual cases was left to the judgment of the supervisor. Discipline did not have to follow any particular sequence, but could begin anywhere the supervisor felt was appropriate, depending on the seriousness of the offense.

The fact that a company leaves enforcement of discipline to the discretion of supervisors does not in and of itself establish racial discrimination. *Tate v. Weyerhaeuser Co.*, 723 F.2d 598 (8th Cir. 1983), *cert. denied* 469 U.S. 847, 105 S. Ct. 160, 83 L. Ed. 2d 97 (1984).

Physicians Mutual also had a policy that distinguished

between long-term and short-term employees. A short-term employee was more likely to be placed on probation than was a long-term employee. The short-term employee was given probation to permit that employee time to improve, but with a long-term employee who knew the job but did not perform adequately, the company felt that probation was not necessarily the correct step to follow prior to termination. Scott was considered a long-term employee.

The evidence discloses that on December 12, 1983, McCarthy spoke to Scott and another employee on her crew about problems they were having working together. On May 20, 1984, McCarthy spoke with Scott and others working the third shift about poor job performance. McCarthy told them that unless production improved they could be placed on probation or, if that did not work, they could be terminated. On August 1, 1984, Scott received a written warning because of poor production and incomplete work. On August 3, 1984, McCarthy spoke with Scott and two coworkers about a mistake made by them the previous night. McCarthy informed them that they could be fired. Scott signed a written memo which stated that she could be fired if she made the same type of error again.

On the night of October 9, 1984, McCarthy worked in presort and observed Scott. He noted her lack of concern for her work slowed production. In an October 10, 1984, memo to Scott's personnel file, McCarthy stated that he observed Scott work for 30 minutes and determined that she did not do her fair share, which also slowed production. Scott was involuntarily terminated by McCarthy in the middle of her shift. Our review of Scott's disciplinary record reflects that at and for a period of time before her discharge, Scott was not performing her job satisfactorily. McCarthy testified that although he did not record it in his reports, several employees complained about Scott's work performance. One of Scott's coworkers testified that at times Scott's work was "bad" and slow and that on a couple of occasions he talked with McCarthy about it.

On Scott's disciplinary action report addressing her discharge, McCarthy wrote that the termination was necessary because (1) her paperwork had been poor with no improvement

made; (2) on several occasions her machine was left dirty; and (3) her production had been very low. McCarthy continued: "The teamwork concept is used in presort, due to poor production I've been working with presort to find ways to get production at a proper level, I've observed Betty [sic] leaving the machine often and basically working at a slow rate of speed, thus causing the rest of the team to suffer." None of the reasons cited by McCarthy at the time of Scott's discharge evidence an intent to discriminate on the basis of race.

Scott presented evidence of other employees' personnel and disciplinary records. While the NEOC considered these records, it should be noted that the records of those employees not supervised by McCarthy are not necessarily relevant. See, *Tate v. Weyerhaeuser Co., supra.*

From *Tate,* it can be gathered that a change or even a difference in managers is not a defense to claims of racial discrimination. Nevertheless, the change or differences in managers may suggest a basis other than racial discrimination for a difference in treatment.

At least two coworkers worked directly with Scott the night she was discharged. One of Scott's white, female coworkers, who testified in Scott's behalf, stated that in her estimation based on observation, Scott was performing her job as expected on the night she was terminated. This employee worked in the presort area only if help was needed, perhaps once a month. This coworker, who "messed up" on the job, was placed on probation, and then quit, testified that there was a "good deal of hatred" between herself and McCarthy. She also testified that she was in a "dream state" or let her mind wander while working at Physicians Mutual. The second coworker, a black male, could not be located to testify.

Scott acknowledges receiving some of the forms of discipline set forth above and, in fact, admitted not appropriately performing her job on at least one occasion. Scott testified that she was upset with the lack of fairness in procedure because she had no knowledge that she was not performing well. Her personnel record and her testimony on cross-examination reflect she did have notice.

At the time she was discharged, Scott did not mention

anything about discrimination. Scott also did not mention anything about discrimination during her exit interview with the vice president of personnel. A couple of days after her termination, in a nonwork setting, Scott mentioned to a Physicians Mutual black supervisor that she felt that she had been treated unfairly. Again, there was no reference by either party to discrimination.

During a later conversation with this same supervisor, again in a nonwork setting, the topic of discrimination arose. Scott testified that the supervisor asked her if she felt that she might have been discriminated against by McCarthy. Scott replied, "No." Later, after Scott reflected upon her situation, she decided that she had been discriminated against because she was black.

Scott testified that before she was terminated she felt Physicians Mutual was a fair place to work. Scott had been accommodated by being granted a transfer to the night shift so that she could satisfy her schedule. Additionally, Scott testified that McCarthy had gone out of his way to help her on occasion.

In large part, Scott's contention that she was fired as a result of racial discrimination is based upon irrelevant evidence and a faulty perception of the law. As an example, Scott was never accused of tardiness. Yet, in support of her discrimination charge, she complains that a coworker was not disciplined for being tardy. The evidence is undisputed that the coworker was a student taking night classes. Because of her school schedule she was given leave to arrive at work after the shift started. The complaint about this coworker has no relevancy. Scott claims she never knew that her work performance was deficient, although admittedly she was warned on more than one occasion that she, along with others, could be fired because of poor production.

Scott claims she was discriminated against on account of race because she was not placed on probation before being fired. The record is uncontroverted that six other persons, three white and three black, were fired without being placed on probation. Scott also misconceives the law when she urges she was qualified to perform the work to which she was assigned. Perhaps she was at one time, but her poor performance prior to

her discharge is crucial and makes irrelevant her earlier qualification for the position. See *Bell v. Fremar Corp.*, 36 Fair Empl. Prac. Cas. (BNA) 547 (1984).

Under the facts presented, Scott has failed to prove that at the time of her termination, she was qualified to perform her job. This missing element, along with the fact that a black male was hired to fill Scott's position, precluded Scott from establishing a prima facie case of racial discrimination.

The record reflects overwhelmingly that Scott failed to prove a prima facie case of racial discrimination. Even if Scott had established a prima facie case, she failed to prove by a preponderance of the evidence that the reason for her discharge from employment articulated by Physicians Mutual was not legitimate or the true reason Scott was fired, but a pretext for racial discrimination.

The evidence simply does not support a finding that Physicians Mutual treated Scott less favorably than other similarly situated employees. Scott's first and second assignments of error have no merit.

Scott's final three assignments of error can be consolidated. They claim in substance that the district court did not give appropriate weight or legal analysis to the evidence. In making its findings the district court noted that it was fully aware that the hearing examiner had the opportunity to observe the witnesses and their demeanor and to make judgments as to their credibility, particularly as to McCarthy. Taking into consideration the fact that the hearing examiner observed and heard the witnesses, the district court still found that the conclusions of the hearing examiner were not supported by a preponderance of the evidence.

The standard of review in the district court is de novo on the record. The district court may not vacate, modify, or set aside an order of the NEOC unless "[t]he findings of the commission in support of such order are unreasonable or arbitrary or are not supported by a preponderance of the evidence." Neb. Rev. Stat. § 48-1120(3)(b) (Reissue 1984). See, also, *Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 371 N.W.2d 688 (1985). Reviewing courts are not precluded from disregarding credibility or actual findings of the original finder of fact. See, *N.L.R.B. v. Payless*

*Cashway Lbr. St. of So. St. Paul, Inc.*, 508 F.2d 24 (8th Cir. 1974); *N.L.R.B. v. Bausch & Lomb, Inc.*, 526 F.2d 817 (2d Cir. 1975) (on appeal, credibility decisions may be overturned if evidence to the contrary is overwhelmingly compelling); *Portable Electric Tools, Inc. v. N.L.R.B.*, 309 F.2d 423 (7th Cir. 1962) (an appeals court is not precluded from independently determining what weight credible testimony should be given when evaluating the record as a whole).

The rulings of the NEOC are not supported by the record. The order of the district court vacating the order of the NEOC is affirmed for the reasons herein stated.

AFFIRMED.

WHITE, J., not participating.