Algie E. HOLMES, Plaintiff,

v.

ARCHER DANIELS MIDLAND COMPANY, Defendant.

No. 4:09CV3192.

United States District Court, D. Nebraska.

July 16, 2010.

Joy A. Shiffermiller, Shiffermiller Law Firm, Lincoln, NE, for Plaintiff.

David R. Buntain, Cline, Williams Law Firm, Lincoln, NE, Timothy A. Wolfe, Meckler, Bulger Law Firm, Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, District Judge.

The plaintiff, Algie E. Holmes ("Holmes"), was employed as a laborer by the defendant, Archer Daniels Midland Company ("ADM"), from August 12, 2008, until June 25, 2009, when he was terminated for continued poor job performance after he clocked out and left work without permission. Holmes claims he was terminated because of his race and also in retaliation for reporting a work-related injury and complaining about racial discrimination. Holmes, who is African–American, alleges that he was harassed and discriminated against by white supervisors during the ten months he worked for ADM.

This action was filed in the District Court of Lancaster County, Nebraska, on August 11, 2009, and was removed to federal court on September 9, 2009, based on

diversity jurisdiction. The complaint contains two causes of action: (1) a claim that Holmes was discriminated against because of his race, in violation of the Nebraska Fair Employment Practice Act ("NFE-PA"), *Neb.Rev.Stat. §§ 48–1101 to 48–1125;* and (2) a claim that Holmes was "wrongfully discharged ... in violation of Nebraska law and public policy." (Filing *1* ("Complaint"), p. 11)

ADM has filed a motion for summary judgment and, in accordance with our local rules, has included in its supporting brief a statement of material facts, consisting of 68 numbered paragraphs with appropriate references to the pleadings, affidavits, and other filed evidentiary materials. Most of these material facts are not controverted by Holmes, and therefore are deemed to be true. *See NECivR 56.1(b)(1)* ("*Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.*") (emphasis in original). For those facts which are controverted by Holmes,[1] I have reviewed the record to decide whether a genuine dispute exists. Based on that review, and on Holmes' admissions, I find that the following facts stated in ADM's brief are undisputed:

1. Holmes specifies in his opposing brief that paragraphs 14, 17, 18, 21, 23, 24, 25, 27, 33, 34, 35, 38, 40, 43, 44, 47, 51, 52, 57, 60, 63, 67, and 68 of ADM's statement of material facts are controverted. I find that the record does not fully support paragraphs 25, 27, 43, 47, 52, and 67 of ADM's statement because:

(1) In paragraph 25, ADM states that "Plaintiff admits this May 1, 2009, accident was a performance problem." Holmes only admitted "it was a problem" that he had caused the accident. (Filing 23–1 ("Holmes Depo."), at 125:18–21)

(2) In paragraph 27, ADM states that "Plaintiff does not know who else ADM has asked to take drug tests." Holmes actually testified that he did not know the number of other people who had been asked to take drug tests. (*Id.,* at 126:22–24)

(3) In paragraph 43 ADM states that "Plaintiff admits he had performance problems including poor attendance, the May 1, 2009 crash, and failing to do timely and satisfactory work." Holmes did not make such an admission. When asked if he was aware of any facts to suggest that the reasons given for his termination were pretextual, Holmes stated, "I never really had any major complaints or problems with my work while I was on the day shift. Only when I went to rotate the shifts did I have a lot of problems when I was on Will Barr's shift." (*Id.,* at 170:14–24) Holmes agreed with ADM's counsel that those problems included his attendance, the May 1 accident, and getting his job done on time and to the satisfaction of his employer, but Holmes also testified that he did not agree with Barr's assessment of his work or that his attendance was a performance problem. (*Id.,* at 170:25–172:23)

(4) In paragraph 47, ADM states that "Plaintiff has no other facts [beyond those stated in paragraph 46] to support his claim [that he was fired because of his race]." Holmes indicated that, to his knowledge, he had testified about all the facts supporting his claim; he did not directly concede that the facts listed by ADM were all-inclusive. (*Id.,* at 180:18–85:–20)

(5) In paragraph 52, ADM states that "Plaintiff cannot explain how ADM discriminated against him on the basis his race when the position was awarded to an African–American coworker." At his deposition, Holmes was asked "why it is that you believe that you weren't given that position because of your race when it was originally awarded to an African–American employee who took himself of the job?" Holmes replied, "I don't know why.... All the things that I just said that led to ... the termination is why I believe that." (Holmes Depo., at 202:6–19)

(6) In paragraph 67, ADM states: "At his deposition, Plaintiff testified that he is not pursuing any such retaliation claims [regarding work related injury resulting in a disability and his complaints of harassment.]" Holmes was asked toward the end of the deposition if there was "[a]ny other retaliation you are claiming in this case?" (Holmes Depo., at 240:25–241:2) His negative response to this vague question does not constitute a waiver of any claims.

1. Plaintiff, who is African–American, is a resident of Lincoln, Nebraska.

2. ADM is a Delaware corporation doing business in Nebraska.

3. ADM operates a soybean processing plant in Lincoln. Plaintiff applied for employment with ADM on June 30, 2008.

4. Extraction Plant Manager John Baumgartner interviewed and hired Plaintiff.

5. Plaintiff got along well with Baumgartner and Baumgartner was fair to Plaintiff.

6. ADM hired Plaintiff as an entry level Laborer and Plaintiffs job was to ensure the facility was clean.[2]

7. ADM provided Plaintiff with a copy of the plant rules which he signed for at his orientation on August 12, 2008. Plaintiff understood those rules.

8. ADM provided Plaintiff with a safety manual during orientation. Plaintiff understood that safety was important to ADM.

9. ADM provided Plaintiff with a copy of its drug and alcohol policy during Plaintiffs orientation. Plaintiff understood the policy and knew that ADM could drug test employees involved in workplace accidents.

10. ADM covered its anti-harassment policy with Plaintiff during Plaintiff's orientation.

11. Plaintiff worked in the Extraction Department and reported to John Baumgartner, Extraction Plant Manager, Bryce Niels[e]n, Plant Superintendent, and shift supervisors, including Will Barr.

12. Plaintiff was the only laborer on his shift.

13. Because of his position, Plaintiff would not know if ADM took any disciplinary action against a co-worker.[3]

14. Plaintiff understood ADM's attendance control policy which required him to be at his workstation on time each scheduled workday.[4] Plaintiff understood that absenteeism burdens fellow employees and increases plant costs.

15. Plaintiff understood that ADM used a three step point system for attendance and that if he accumulated 10 points in a rolling 52 week period, ADM would terminate his employment.

16. On January 20, 2009, ADM issued Plaintiff a written warning for attendance problems. Plaintiff admits he was either late or absent on all the days for which he was assessed points.

---

**2.** Holmes additionally states that his "duties included helping out where needed and he performed several other jobs besides cleaning." (Filing *24* ("Plaintiff's Brief"), p. 5, ¶ 6)

**3.** Holmes states that although he "did not have access he was aware through his co-workers that they were not subject to the same disciplinary actions that he was." (Plaintiff's Brief, p. 5, ¶ 13) However, the deposition testimony he cites in support of this statement does not indicate that he had such an awareness.

**4.** Holmes testified he did not understand at first that under the policy he would be assessed a point for each day of absence because of illness, injury or unapproved person-al leave from work. (Holmes Depo., at 67:2–7) In particular, Holmes claimed he did not know that he would get points for taking time off from work when his daughter was born. (*Id.*, at 68:15–25) Holmes later acknowledged that a written warning for attendance he received on January 20, 2009, did not include any points for missing work when his daughter was born (*id.*, at 102:11–104:19), but testified that he "was told by Bill Barr that [he] was going to be written up for it." (*Id.*, at 105:4–5) Holmes also initially disputed that some of the first five points he received were properly assessed, (*id.*, at 69:10–20), but subsequently admitted that all of the points assessed as of January 20, 2009, were appropriate. (*Id.*, at 105:22–106:2)

17. On March 10, 2009, ADM issued Plaintiff a final written warning for attendance problems after four new attendance incidents since ADM issued the January 20, 2009 written warning. Plaintiff admits he was either late or absent on all the days for which he was assessed points.[5]

18. By May 31, 2009, Plaintiff had accrued 9.5 attendance points, meaning that if he got ½ point more by October 2009, ADM would terminate his employment pursuant to the attendance policy.

19. Plaintiff understood his attendance was a problem and that good attendance was important to ADM.

20. Plaintiff missed multiple days of work for which ADM could have, but did not assess any attendance points against him.

21. Plaintiff admits ADM was following its written policy when it disciplined him for attendance problems, and that ADM even gave him some breaks on attendance violations.[6]

22. On May 1, 2009, Plaintiff was driving a loader to move rail cars at ADM's Lincoln plant. Rather than push the cars, Plaintiff pulled them.[7]

23. Plaintiff lost control of the rail cars and caused serious property damage to the loader, a railcar, a rail switch, a rail car coupling others.[8]

24. As a result of this incident, ADM issued a written warning to Plaintiff and the non-driving coworker who was working with him.[9]

\* \* \*

26. Following the May 1,2009, accident, ADM asked Plaintiff to take a drug test which ADM had a right to request.[10]

\* \* \*

28. ADM issued Plaintiff a final written warning on May 28, 2009 for continued performance problems including incidents on May 17–19 and 24, 2009, in which Shift Supervisor Will Barr was not satisfied with Plaintiff's work performance.[11]

29. Will Barr informed Plaintiff that he needed to do a better job cleaning the facility.

---

5. After expressing a belief that he should not have gotten the points, Holmes also admitted during his deposition that there was no reason why any of these absences would have been excused under ADM's attendance control program. (Holmes Depo., at 108:4–24)

6. Holmes disputes this statement of fact in his opposing brief by claiming that he "was improperly given points for days he had missed when he had a doctor's appointment." (Plaintiff's Brief, p. 7, ¶ 21) However, there is no admissible evidence to support this claim. Holmes testified that he thought he "went to the chiropractor or something" on March 6, but when asked if he had provided the company with any documentation related to that absence, Holmes stated, "Not to my knowledge, I don't believe I did." (Holmes Depo., at 116:9–117:15)

7. Holmes testified he did not know at the time that the railcars should be pushed rather than pulled. (Holmes Depo., at 122:19–123:4) Holmes states in his brief that, to his knowledge, "other than Mr. Spies, who was directly involved in the May 1, 2009 incident, no other

employees were disciplined for pulling rather than pushing railcars" (Plaintiff's Brief, p. 7, ¶ 22), but the deposition testimony cited by Holmes does not support this statement.

8. Holmes denies that he was completely responsible for the incident. (Plaintiff's Brief, p. 7, ¶ 23) He testified that a co-worker, Steven Spies, who was also disciplined, had removed the hand brakes on all of the cars. (Holmes Depo., at 127:13–25)

9. Holmes testified that he did not receive the written warning until "a month or so" after the accident. (Holmes Depo., at 121:10–18)

10. Holmes declares under penalty of perjury that "Jeff Burch (White) knocked a 20 foot pole down and he was not sent for a drug test." (Filing 25–1 ("Holmes Decl."), p. 2, ¶ 5)

11. While indicating that "Defendant's statement of fact # 28 is uncontroverted," Holmes states that he "believes his performance did not merit the warning." (Plaintiff's Brief, p.

30. ADM informed Plaintiff on May 28, 2009, that he was not meeting expectations with respect to the amount of time taken to clean the facility as well as quality of cleaning he was doing.

31. May 28, 2009, Plaintiff was on two separate final written warnings—one for attendance and one for poor performance—and he understood his job was in jeopardy.

32. On June 24, 2009, ADM had a smolder in a dryer. Because of a fire risk, ADM had to dump tons of processed beans out of the dryer. This incident caused all production to be stopped and the plant was deemed to be down.[12]

33. When the plant is down, ADM expects all employees at the plant to remain on duty until the problem is remedied, unless individually relieved by plant management.

34. Plaintiff understood that he needed to contact a supervisor if the plant went down.[13]

35. Plaintiff understood that walking off the job without supervisor approval was strictly prohibited.

36. ADM communicates with its employees in the plant face-to-face, by radio and by "gray phone," which includes an intercom system. Both the radio and the gray phone systems could be heard throughout the plant.[14]

37. On June 24, 2009, Plaintiff clocked out and went home despite the plant being down.

38. Plaintiff saw the blue light that tells employees the plant is down, but he did not check into it.

39. Plaintiff did not stay at work and he did not check with anyone in management before he left the plant.

40. Following this incident, Baumgartner made the decision to terminate Plaintiffs employment. ADM terminated Plaintiff's employment on June 25, 2009.[15]

41. Plaintiff met with John Baumgartner, Bryce Nielsen, Will Barr and his union representative on June 25, 2009 at which time ADM gave Plaintiff his termination letter.

42. The termination letter identifies Plaintiff's continued poor job performance as the reason for ADM's decision.

9, ¶ 28) He declares: "In 5/09, Mr. Bahr [sic] wrote me up for three days alleging he told me to clean an area and it took me three days to complete. I deny these allegations." (Holmes Decl., p. 2, ¶ 7) Holmes testified that he "didn't get along with [Will Barr]," who had very high expectations of him and had him "doing a lot of stuff that didn't even seem realistic." (Holmes Depo., at 138:9–17)

**12.** Holmes testified: "I knew the plant was down, yes. But I didn't know to the extent. I always go home when ... the plant's down." (Holmes Depo., at 163:2–5)

**13.** Holmes answered "Yes" when asked if "you understood as well from your orientation and discussions with plant management that ... if the plant went down, you were to get in contact with the supervisor immediate-

ly?" (Holmes Depo., at 81:24–82:12) Later in his deposition, however, Holmes stated that "we never always contacted the foreman or supervisor. They always contacted us or we always—we never had to contact them when the plant was down." (*Id.*, at 163:16–19)

**14.** At his deposition, Holmes denied hearing any announcement either over the gray phone or the radio that all plant employees were expected to help clean up the dumped soybean product. (Holmes Depo., at 161:13:164:16)

**15.** Holmes notes that the termination letter was actually signed by Bryce Nielsen. (Plaintiff's Brief, p. 11, ¶ 40) All of the written warnings Holmes received were also signed by Nielsen. (Filings *23–1,223–1,323–1,423–16* )

\* \* \*

45. Nevertheless, Plaintiff claims he was fired because of his race.

46. In support of this claim, Plaintiff states that he was the only African–American male on his shift. He believes he was mistreated by being asked to work faster; clean better; measure bins; not to go into areas of the plant where he was not assigned to work; and, he was not permitted to switch shifts at his termination meeting.

\* \* \*

48. Plaintiff also contends he was denied a promotion at ADM because of his race.

49. Plaintiff thinks (but could not state for certain,) the position involved was a meal loader job.

50. Plaintiff states ADM told him he did not get the position because of his attendance problems.

51. The meal loader position was awarded to Greg McCray, (who is African–American,) in May 2009.

\* \* \*

53. McCray voluntarily disqualified himself from the meal loader job. ADM did not select Plaintiff to replace McCray.[16]

54. Plaintiff was on final written warning for attendance when he signed the job bid for the meal loader position.

55. The bid sheet says that dependability is a requirement for the job.

56. Plaintiff admits that being on a final written warning for attendance does not show dependability.[17]

57. Plaintiff admits he crashed the loader on May 1, 2009, while working in meal loadout, . . . .

58. Plaintiff claims ADM discriminated against him in the terms and conditions of his employment because ADM did not to allow him to select his own supervisor after Will Barr provided him negative feedback about his performance. Plaintiff claims other employees traded shifts, but he cannot name anyone who did this and he does not know the facts associated with anyone else's shift move.[18]

59. Plaintiff did not raise the concept of switching shifts until his termination meeting.

60. Baumgartner has not permitted employees to switch shifts because employees are unhappy with negative performance feedback.

61. Plaintiff believes it was race discrimination to have him clean up two spills at the plant because he believes it was too much work for one person to do.

62. Plaintiff admits that cleaning spills was work that needed to be done; was work that a laborer would do; and, that he was the only laborer on shift.[19]

---

**16.** The meal loader position was then awarded to Danny Mitchell, who is white. (Holmes Depo., at 200:3–10, 205:24–206:12; Holmes Decl., p. 3, ¶ 12)

**17.** Holmes objects to this statement as lacking in foundation and because "there is no showing that [the final written warning for attendance] played any part in the decision whether to promote[.]" (Plaintiff's Brief, p. 14, ¶ 56) The objections are overruled. John Baumgartner states in his affidavit that ADM "did not award the position to Plaintiff because he was on final written warning for attendance and because he had crashed a meal loader on May 1, 2009[.]" (Filing *23–21*, p. 4, ¶ 15)

**18.** Holmes testified that one unnamed employee changed shifts because he could not get along with his foreman. Holmes thought the foreman was Mike Tubbs, but he was not sure. (Holmes Depo., at 210:6–211:13)

**19.** Holmes denies, however, that the work always had to be done by the end of a shift. He testified that it was not unusual for the laborer on the next shift to finish a cleanup job. (Holmes Depo., at 216:7–18)

63. Plaintiff contends ADM retaliated against him by firing him after he filed his charge of discrimination with the EEOC.

64. However, Plaintiffs charge is stamped June 25, 2009, which is the same date that ADM terminated his employment.[20]

65. Plaintiff never discussed the prospect of filing a charge of discrimination with anyone in ADM management.[21]

66. In his Complaint, Plaintiff alleged he was "terminated in retaliation for work related injury resulting in a disability and his complaints of harassment."

* * *

68. Baumgartner had no knowledge of a discrimination claim by Plaintiff or any suggestion that Plaintiff would be filing a charge of discrimination.

(Filing *22* ("Defendant's Brief"), pp. 2–12 (subheadings and citations to record omitted).)

Considering these undisputed facts, I conclude for the reasons discussed below that ADM's motion for summary judgment should be granted.

## DISCUSSION

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)(2)*. It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir.1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir.1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with " 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir.1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992)). Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her

---

**20.** The evidence shows Holmes first contacted the Nebraska Equal Opportunity Commission ("NEOC") about filing a discrimination complaint on June 9, 2009. (Holmes Depo., at 238:9–12; Holmes Decl., p. 3, ¶ 15 & attachment)

**21.** Holmes testified that he talked to two union representatives before going to the NEOC. (Holmes Depo., at 188:14–190:7; 240:13–24)

case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### 1. Race Discrimination Claim

■ The Nebraska Fair Employment Practice Act provides that "[i]t shall be an unlawful employment practice for an employer ... [t]o fail or refuse to hire, to discharge, or to harass any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, disability, marital status, or national origin." *Neb.Rev.Stat. § 48–1104(1).* In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII and the ADA. *Orr v. Wal–Mart Stores, Inc.,* 297 F.3d 720, 723 (8th Cir.2002).

■ Because there is no direct evidence of race discrimination in this case, the burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), will be employed. Under this framework, "a complainant has the burden of proving a prima facie case of discrimination, and once the complainant [has] succeeded in that respect, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for rejection or discharge of the employee. Should the employer carry the burden, the employee must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination." *McCamish v. Douglas County Hosp.,* 237 Neb. 484, 466 N.W.2d 521, 525 (1991).

■ establish a prima facie case, Holmes must show that "(1) he is a member of a protected class; (2) he was qualified for the position (sometimes articulated as meeting the employer's legitimate expectations); (3) he suffered an adverse employment action; (4) under circumstances permitting an inference that the action was a result of unlawful discrimination." *Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 520 (8th Cir.2010).

The first element is clearly satisfied. Holmes is an African–American.

Regarding the second element, the Eighth Circuit has "recently recognized that a tension appears to exist in our case law as to what a plaintiff must establish regarding qualifications at this stage of the analysis." *Id.,* at 521 n.7 (citing *Elam v. Regions Fin. Corp.,* 601 F.3d 873, 879 n. 4 (8th Cir.2010)). That is, the law is uncertain in this circuit whether ADM's reasons for not promoting Holmes and for discharging him should be considered in determining whether Holmes can prove a prima facie case of discrimination. Compare *Lake v. Yellow Transp., Inc.,* 596 F.3d 871, 874 (8th Cir.2010) ("Lake establishes his prima facie case if, setting aside Yellow's reason for firing him, he was otherwise meeting expectations or otherwise qualified."), with *Zhuang v. Datacard Corp.,* 414 F.3d 849, 855 (8th Cir.2005) (considering the reasons the employer gave for firing the employee when evaluating the qualified element of the prima facie case). The Nebraska Supreme Court has

previously taken the *Zhuang* approach by indicating that "an employee's poor performance may preclude the employee from establishing that the employee was qualified for the position at the time of the employee's discharge." *Physicians Mut. Ins. Co. v. Scott,* 231 Neb. 947, 439 N.W.2d 72, 75 (1989).

Even though ADM has presented evidence that Holmes was not a dependable worker, it has also stated that he was "an entry level Laborer . . . [whose] job was to ensure the facility was clean." (Paragraph 6 of ADM's statement of material facts) ADM has not presented evidence that Holmes was unable to perform physical labor or lacked any necessary skills for simple cleaning work—only that he did not perform the job to his supervisor's satisfaction and was frequently absent. ADM's evidence likewise fails to show that the sought-after meal loader position required any special qualifications, and, in fact, it appears Holmes was performing some function of the meal loader job on May 1, 2009, when he had the accident. The May 1 accident and Holmes' poor attendance record are cited by ADM as reasons why Holmes did not receive the promotion, but they do not necessarily prove that he was unqualified.

As to the third element, it is clear that ADM's decision to discharge Holmes was an adverse employment action. *See Norman v. Union Pacific R.R. Co.,* 606 F.3d 455, 460 (8th Cir.2010) (termination "undoubtedly" adverse employment action). ADM also does not dispute that a reassignment to the meal loader position would have been a promotion for Holmes. Failure to promote is an adverse employment action. *Robinson v. Potter,* 453 F.3d 990, 994 (8th Cir.2006). To determine whether Holmes' other complaints of mistreatment provide grounds for an actionable claim of discrimination, however, will require closer examination.

■ "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Fraternal Order of Police v. County of Douglas,* 270 Neb. 118, 699 N.W.2d 820, 830 (2005) (quoting *Spears v. Mo. Dept. of Corr. & Human Resources,* 210 F.3d 850, 853 (8th Cir.2000)). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard . . . but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." *Id.*

In addition to not receiving the meal loader job and being fired, Holmes complains about the following incidents:

(1) On September 15, 2008, Holmes questioned Bryce Nielsen why he did not receive higher pay for performing mill load out and truck dump work; he was told there was no paperwork to prove that he performed those tasks. (Complaint, p. 7, ¶¶ 7–8; Holmes Decl., p. 1, ¶ 1) Failure to receive the proper rate of pay could constitute an adverse employment action. *See, e.g., Cunningham v. Penn Nat. Holding Corp.,* No. 1:08–CV–0587, 2010 WL 456817, *3 (M.D.Pa., Feb. 2, 2010) ("[P]aying an individual a lower salary for discriminatory reasons can be an adverse employment action.") (quoting *Sherrod v. Phila. Gas Works,* 57 Fed.Appx. 68, 73 (3d Cir.2003)).

(2) Holmes was laid off from work after his doctor restricted him to lifting no more than 15 pounds because of a work-related injury. (Complaint, p. 8, ¶¶ 9, 11, 12; Holmes Decl., pp. 1, ¶ 2) Such a layoff could also constitute an adverse employment action. *See Lanxon v. Crete Carrier Corp.,* No. 4:00CV3182, 2001 WL 1589627, *5 (D.Neb., Dec. 13, 2001) (forced

medical leave could qualify as adverse employment action). Holmes testified that he was laid off "between three and six days" because of the back injury.[22] (Holmes Depo., at 218:21–234:12)

(3) Holmes was required to submit to a fitness-for-duty examination even though his own doctor had released him to return to work. (Complaint, p. 8, ¶¶ 13, 14; Holmes Decl., pp. 1–2, ¶ 2) The Eighth Circuit has questioned whether requiring a medical examination ever could be an adverse employment action. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir.2000) (finding fitness-for-duty exam, which was authorized by USPS regulations, was not adverse employment action). Nonetheless, for purposes of the summary judgment motion, I will assume that the fitness-for-duty exam was an adverse employment action.

(4) Negative disciplinary points were assigned to Holmes for missing work due to his injury and medical care, and he also was written up for absences that did not occur. (Complaint, p. 8, ¶¶ 15–17; Holmes Decl., p. 2, ¶¶ 2–4) By themselves, these

actions did not produce a material employment disadvantage; however, the large number of unexcused absences did prevent Holmes from receiving a promotion. "A negative performance review is not in itself an adverse employment action ... and it is actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee." *Thomas v. Corwin,* 483 F.3d 516, 529 (8th Cir.2007) (quoting *Burchett v. Target Corp.,* 340 F.3d 510, 518 (8th Cir.2003)). Moreover, Holmes has admitted that "ADM was following its written policy when it disciplined him for attendance problems, and that ADM even gave him some breaks on attendance violations. (Paragraph 21 of ADM's statement of material facts) Holmes has also admitted that as of March 10, 2009, when he was issued a final written warning, he had accrued 9.5 attendance points. There is no evidence to support Holmes' contention that points were improperly assessed.[23]

(5) Holmes was written up for the accident on May 1, 2009, and was re-

---

**22.** ADM's attendance records show that Holmes was excused from work for: (1) one day during the workweek ending November 23, 2008, because of a doctor appointment concerning his back; (2) one day during the workweek that ended on December 7, 2008, for a non-related back injury; and (3) two partial days during the workweek ending December 14, 2008, for doctor appointments and a physical. Otherwise, Holmes was working each day during this period of time. (Filing *27–2* )

**23.** In opposing the motion for summary judgment, Holmes declares: "On or about 11/1/08, I was written up the absenteeism, however, I believe some of the absences recorded, including 'car problems' were not mine and I provided doctor's notes to cover

absences." (Holmes Decl., p. 2, ¶ 3) This statement of belief is inconsistent with Holmes' prior testimony, when he specifically admitted being late for work on the days indicated in the first warning letter of January 20, 2009, including being late on October 7, 2008, due to "car problems" (the only such entry in any of the attendance records). (Holmes Depo., at 102:11–18; Filing *23–12* )

The records show that Holmes was assessed points for absences due to illness on January 5 and 6, 2009, for a child's doctor appointment on February 2 and March 23, 2009, and for a dental appointment on February 19, 2009. (Filings *23–1, 223–1, 327–2* ) There is no evidence to show these were excusable absences. Holmes even testified, "I don't know what would have excused them...." (Holmes Depo., at 106:21–108:15)

quired to submit to a drug test. (Complaint, p. 9, ¶¶ 19–20; Holmes Decl., p. 2, ¶ 5) Depending on the circumstances, a mandatory drug test may be an adverse employment action. *See Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001–02 (7th Cir.2000) ("[W]here a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees, requiring that the employee submit to the drug test as a condition of employment may be an adverse employment action that is actionable under Title VII.") (citing *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624–25 (8th Cir.1995)). In this case, Holmes has admitted that ADM had a right to request the drug test.[24] (Paragraph 26 of ADM's statement of material facts)

(6) Holmes was disciplined by Will Barr in May 2009 for unsatisfactory cleaning. (Complaint, p. 9, ¶ 22; Holmes Decl., p. 2, ¶ 7) The evidence establishes that the alleged disciplinary action consisted of another written warning, which later contributed to Holmes' termination.

(7) On June 1, 2009, when Holmes called to report an absence due to his daughter's hospitalization, Bryce Nielsen played the message over the intercom for all employees to hear. (Complaint, p. 9, ¶ 23; Holmes Decl., p. 2, ¶ 6) This isolated incident cannot be characterized as an adverse employment action, but it may be considered as part of a hostile work environment claim.[25]

---

"A party cannot offer testimony that contradicts the party's earlier statements made under oath to create a genuine issue of material fact." *Progressive Northern Ins. Co. v. McDonough*, 608 F.3d 388, 391 (8th Cir.2010). "Contradictory testimony in these instances is typically only allowed when the party was confused and needs to clarify an earlier statement." *Id.*

"[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." *Bacon v. Hennepin County Medical Center*, 550 F.3d 711, 716 (8th Cir.2008) (quoting *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir.2008)). "Rather, the plaintiff 'must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.'" *Id.* (quoting *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir.2005)).

Holmes also declares: "In or about 12/08, I was notified that I was up to 9 points, yet, I was not absent that much." (Holmes Decl., p. 2, ¶ 4) The records actually show that as of the end of December 2008, Holmes had accrued three total points (for being late for work on six occasions). (Filings *23–1,223–1,327–2*)

24. ADM's substance abuse policy specifies that an employee who has been involved in a plant accident may be required to submit to drug and alcohol testing. (Filing *23–10*, p. 3)

25. To establish a Title VII race-based hostile work environment claim, a plaintiff must show (1) he is a member of a protected group, (2) he is subjected to unwelcome race-based harassment, (3) the harassment was because of his membership in the protected group, and (4) the harassment affected a term, condition, or privilege of his employment. *Carpenter v. Con–Way Cent. Express, Inc.*, 481 F.3d 611, 617–18 (8th Cir.2007). A hostile work environment "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" as viewed objectively by a reasonable person. *Id.* (quoting *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir.2003)). "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." *Id.* (quoting *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir.2006)). "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.*

(8) On June 19, 2009, Holmes again was disciplined for not cleaning an area to his supervisor's satisfaction. (Complaint, p. 9, ¶ 24; Holmes Decl., p. 2, ¶ 9) This incident is not mentioned in ADM's statement of material facts, but it may also be considered as part of a hostile work environment claim.

(9) Will Barr required Holmes to measure bins in the dark, between 1:00 a.m. and 2:00 a.m., significantly more often than his co-workers.[26] (Complaint, p. 10, ¶ 25; Holmes Decl., p. 2, ¶ 8) These alleged acts of harassment might be another part of a hostile work environment claim.

(10) Holmes' request to be assigned to a different supervisor was denied. (Complaint, p. 10, ¶ 26; Holmes Decl., pp. 2–3, ¶ 10) Because there is no evidence to show that Holmes had any right to change shifts, the denial of such a request could not be an adverse employment action.[27]

(11) On June 23, 2009, Holmes was verbally reprimanded for taking too long to pull cars. (Complaint, p. 10, ¶ 28; Holmes Decl., p. 3, ¶ 11) This incident also is not mentioned in ADM's statement of material facts, but once again might be part of a hostile work environment claim.

In summary, Holmes suffered an adverse employment action when he was not promoted to the meal loader position and when he was fired. It is also possible that Holmes suffered an adverse employment action when he allegedly (1) was not paid for doing mill load out and truck dump work, (2) was laid off because of a medical restriction, and (3) was required to submit to a fitness-for-duty exam before returning to work. However, Holmes' complaints about being disciplined for absences, being required to submit to a drug test, and being denied a shift change are without merit. Other alleged incidents also do not involve adverse employment actions, but to the extent that Holmes is asserting a hostile work environment claim based on alleged harassing conduct by his supervisors, I find after considering the totality of the circumstances that there is not sufficient evidence to support such a claim. Without going into detail, it is my conclusion that no reasonable jury could find that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of Holmes' employment. I also conclude that no reasonable jury could find the alleged harassment to be race-based.

The fourth and final element of a prima facie case requires a determination of whether an adverse employment action occurred under circumstances permitting an inference that the action was a result of unlawful discrimination. For a failure-to-promote claim, this element can be established by showing that "employees similarly situated who are not part of the protected group were promoted instead." *Moore v. Forrest City School Dist.*, 524 F.3d 879, 883 (8th Cir.2008). While the evidence in this case does not disclose whether the white employee who ultimately received the meal loader position was similarly situated to Holmes, I will assume this element is satisfied. I make this assumption even though the evidence shows that ADM first selected another African–American em-

---

26. Holmes acknowledged at his deposition that measuring bins was part of his job and that he was the only laborer on his shift. (Holmes Depo., at 175:25–177:23)

27. While it is undisputed that the request for a shift change was not made until the termination meeting on June 25, 2009, Holmes testified that he made the request before being told that he was fired. (Holmes Depo., at 166:2–16)

ployee for the job, which arguably eliminates the inference of discrimination.

Holmes also claims that he bid on a second meal loader position in April or May 2009 that was awarded to a white employee, named "Steve," who had less seniority. (Holmes Decl., p. 3, ¶ 12) John Baumgartner states in a supplemental affidavit that during April and May 2009 Holmes only bid on one meal loader position, and no employee named "Steve" was placed in a meal loader position. (Filing 27–1, p. 2, ¶ 4) I find there is a genuine issue of material fact on this issue.

 prima facie case of a racially motivated discharge may be established when the discharged employee's position is filled by a member of an unprotected class. See Physicians Mut. Ins. Co., 439 N.W.2d at 75. Alternatively, it may be shown that similarly situated white employees were not discharged. See Helvering v. Union Pacific R. Co., 13 Neb.App. 818, 703 N.W.2d 134, 155 (2005). Neither circumstance is shown to exist in this case, nor has Holmes presented any other evidence from which it may reasonably be inferred that the termination of his employment was racially motivated.

 Holmes also has presented no evidence to show that a similarly situated white employee (1) received additional compensation for doing mill load out and truck dump work, (2) was not laid off because of a medical restriction, or (3) was not required to submit to a fitness-for-duty exam before returning to work. I therefore find that Holmes is unable to establish a prima facie case of race discrimination regarding these alleged adverse employment actions.[28]

 ADM has the burden to provide a legitimate, non-discriminatory reason why Holmes failed to receive a promotion to the meal loader position. It has met this burden by stating that Holmes was not a dependable employee, as evidenced by the facts that he was given a final written warning for attendance on March 10, 2009, and had caused a serious accident with the meal loader on May 1, 2009.[29] To prevail on his failure-to-promote claim, therefore, Holmes must show that ADM's proffered reasons are pretextual. He may do so by "adduc[ing] enough admissible evidence to raise genuine doubt as to the legitimacy of [ADM's] motive." Anderson v. Durham D & M, 606 F.3d at 521 (quoting Sprenger v.

28. While I have determined that the drug test was not an adverse employment action, I also find that Holmes' evidence regarding a white employee who was not subjected to a drug test after knocking down a 20–foot pole is insufficient because it does not establish that the white employee was similarly situated to Holmes. "The test to determine whether employees are similarly situated to warrant a comparison to a plaintiff is a rigorous one. Specifically, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Helvering, 703 N.W.2d at 155 (citing EEOC v. Kohler Co., 335 F.3d 766 (8th Cir.2003)). The Eighth Circuit applies this rigorous test only at the pretext stage; at the prima facie case stage, it is enough that the employees are "involved in or accused of the same or similar conduct and are disciplined in different ways." Wimbley v. Cashion, 588 F.3d 959, 962 (8th Cir.2009). Because ADM has shown that it had a legitimate, non-discriminatory reason for requiring Holmes to take a drug test (namely, Holmes' accident while operating the meal loader), it was incumbent upon Holmes to present evidence that the other employee was similarly situated in all relevant respects.

29. These reasons are provided with respect to the position that initially was awarded to Greg McCray in May 2009. The second reason may or may not apply to the position that allegedly was awarded to "Steve" in April or May 2009.

*Federal Home Loan Bank of Des Moines,* 253 F.3d 1106, 1110 (8th Cir.2001)).

 are 'at least two routes' for demonstrating a material question of fact as to pretext. First, a plaintiff may succeed 'indirectly' by showing the proffered explanation has 'no basis in fact.' second, a plaintiff can 'directly' persuade the court that a 'prohibited reason more likely motivated the employer.'" *Id.* (quoting *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1120 (8th Cir.2006)).[30] Holmes is unable to show pretext by either method.[31]

Holmes has admitted that he was late or absent from work on all of the days for which he was assessed points in the final written attendance warning, and that he was even given a break on additional absences. He contends that more absences should have been excused, but has no evidence to support this contention. Holmes has also admitted that he caused the accident with the meal loader on May 1, 2009. He contends that a co-worker contributed to the accident, but this does not prove that the written warning that both he and his co-worker received for the accident was undeserved. Holmes speculates that he was not promoted because of his race, but there is no evidence to support this belief. In fact, the evidence shows that another African–American was first selected by ADM to fill the meal loader position.

ADM also has provided a legitimate, non-discriminatory reason why Holmes was fired. Even though Holmes has failed to establish a prima facie case of race discrimination regarding his termination, I will briefly discuss the pretext issue.

ADM has demonstrated that Holmes was fired because he left the plant without permission on June 24, 2009, less than a month after he was issued a final written warning for poor job performance. Holmes denies that his job performance was unsatisfactory, and claims he did not realize that he was supposed to stay at work when the plant went down on June 24, but he has provided no evidence to show that the termination decision was not made in good faith.

 "Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices. Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'" *Edmund v. MidAmerican Energy Co.,* 299 F.3d 679, 686 (8th Cir.2002) (quoting *Cronquist v. City of Minneapolis,* 237 F.3d 920, 928 (8th Cir. 2001)). It may be added that the evidence shows the termination decision was made by John Baumgartner, the same individual who had hired Holmes ten months earlier. "A strong inference arises that discrimination was not a motivating factor if the same individual hired and fired the plaintiff within a relatively short period of time." *Anderson v. Durham D & M,* 606 F.3d at 522–23 (internal quotations omitted).

### 2. Retaliation Claim

 It is "an unlawful employment practice for an employer to discriminate

---

**30.** The Eighth Circuit has also stated that "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake,* 596 F.3d at 874–75.

The first and third examples are "indirect" methods for showing pretext, while the second example is a "direct" method.

**31.** In his brief, Holmes recites applicable caselaw but does not even attempt to argue that ADM's reasons are pretextual.

against any of his or her employees [who] ... has opposed any practice made an unlawful employment practice by the Nebraska Fair Employment Practice Act, [or] ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the act[.]" *Neb.Rev.Stat. § 48–1114.* To establish a prima facie case of unlawful retaliation, an employee must show that he or she participated in a protected activity, that the employer took an adverse employment action against him or her, and that a causal connection existed between the protected activity and the adverse employment action. *Riesen v. Irwin Indus. Tool Co.,* 272 Neb. 41, 717 N.W.2d 907, 915 (2006).

██ Holmes alleges that he "was terminated in retaliation for ... his complaints of harassment." (Complaint, p. 11, ¶ 36) In his brief, Holmes indicates that the protected activity in this case included his "report and complaint he is not getting the same pay for doing the other positions, that his foreman has unreasonable expectations and requires more work of him than others and certainly his indication he is going to complain to the NEOC." (Plaintiff's Brief, p. 28) Prior to the time Holmes contacted the NEOC, however, there is no evidence that he ever made a complaint about racial discrimination. He states in his affidavit that "[o]n or about 9/18/08, I questioned Mr. Nielson [sic] why I did not receive the higher pay when performing mill load out and truck dump" (Holmes Decl., p. 1, ¶ 1), but there is no indication that Holmes openly attributed this alleged mistreatment to his race. Holmes' complained about his difficulties with Will Barr during the termination meeting on June 25, 2009, and requested a transfer to a different foreman, but there is no evidence showing that Holmes made any complaint about race discrimination at that time.

The filing of a discrimination complaint with the NEOC obviously is protected activity, but the evidence establishes that the complaint was not filed until June 25, 2009, the date Holmes' employment was terminated. It is also undisputed that John Baumgartner, who made the termination decision for ADM, "had no knowledge of a discrimination claim by Plaintiff or any suggestion that Plaintiff would be filing a charge of discrimination." (Paragraph 68 of ADM's statement of material facts) Holmes states that he first contacted the NEOC on June 9, 2009 (Holmes Decl., p. 3, ¶ 15), and talked to two union representatives before going to the NEOC (Holmes Depo., at 188:14–190:7; 240:13–24), but Holmes admits he "never discussed the prospect of filing a charge of discrimination with anyone in ADM management." (Paragraph 65 of ADM's statement of material facts) With no evidence to show a causal connection between the filing of the NEOC complaint and his termination, Holmes is unable to establish a prima facie case.

██ Holmes also alleges that he was "terminated in retaliation for work related injury resulting in disability." (Complaint, p. 11, ¶ 36) Holmes mentions the filing of a workers' compensation claim in his brief (Plaintiff's Brief, pp. 25, 29), which could provide the basis for a retaliation claim under Nebraska law. *See Jackson v. Morris Communications Corp.,* 265 Neb. 423, 657 N.W.2d 634, 641 (2003) (recognizing public policy exception to at-will employment doctrine when employer wrongfully discharges employee in retaliation for filing a workers' compensation claim).

However, there is no evidence that a workers' compensation claim was filed before the termination of Holmes' employment. Holmes testified that he did not remember when he filed for workers' compensation, but that possibly it was not until

after his termination. (Holmes Depo., at 234:13–7) In fact, there is no evidence a claim was ever filed. When Holmes was asked at his deposition if he ever filed a workers' compensation claim, he stated: "I never got it. I believe so. But I don't remember when it was." (Holmes Depo., at 234:22–24) When asked if he had any records of the claim, Holmes replied: "Just a paper from the workers' comp when ADM sent me a paper of saying when I got injured and when I talked with the workers' comp department about it. Those papers." (Holmes Depo., at 235:23–236:3) His affidavit does not address the issue. Because Holmes cannot show a causal link between the filing of a workers' compensation claim and the termination decision, this retaliation claim fails as a matter of law.

■ Finally, Holmes argues in his brief "that he was laid off for six days at the time of having a back injury on his job and that the back injury played a part in his termination." (Plaintiff's Brief, p. 25) Citing *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704, 711 (2007), in which the Nebraska Supreme Court held that "a cause of action for retaliatory demotion exists when an employer demotes an employee for filing a workers' compensation claim," Holmes contends that he was unlawfully retaliated against for reporting a work-related injury. While the Court in *Trosper* left open the possibility that other forms of disciplinary action might also give rise to a claim for retaliation,[32] it limited the holding to situations where a workers' compensation claim is filed. "The public policy exception is restricted to cases when a clear mandate of public policy has been violated, and it should be limited to manageable and clear standards." *Id.*, at 707.

As discussed above, there is no evidence that Holmes filed a workers' compensation claim prior to his termination.

## CONCLUSION

Holmes is unable to establish a prima facie case of retaliatory discharge. With the possible exception of a failure-to-promote claim, he is also unable to establish a prima facie case of race discrimination. In any event, ADM has provided legitimate, non-discriminatory reasons for Holmes' non-promotion and subsequent termination. Holmes cannot prove those reasons are pretextual.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 21) is granted. A final judgment dismissing the plaintiff's action with prejudice will be entered by separate document.

## JUDGMENT

Pursuant to the court's Memorandum and Order entered today,

IT IS ORDERED that the plaintiff's action is dismissed with prejudice.

---

**32.** Holmes actual complaint is that "[w]hen you get injured on the job, you [are] supposed to get workers' comp or some form of payment from getting injured. And I didn't." (Holmes Depo., at 234:8–10) Even if Holmes was forced to take unpaid leave because of his back injury, this cannot provide the basis for a retaliation claim.